## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Comcast of Massachusetts III, Inc. | ) | Case No.: **04-12569 RGS** |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OF LAW IN SUPPORT** |
| vs. | ) | **OF PLAINTIFF'S  MOTION FOR** |
| | ) | **DEFAULT JUDGMENT** |
| Lisa Pereira | ) | |
| | ) | |
| Defendant | ) | |

## 1.  Effect of Default

The Plaintiff filed a Complaint in this action on December 7, 2004.  The Defendant was served, by abode service, with copies of the Complaint, Summons and other pertinent documentation on December 27, 2004.  Thereafter, the Defendant failed to appear in this action. On March 7, 2005 Default was entered against the Defendant in this action.  Plaintiff, after requesting and receiving a number of extensions has now moved for Default Judgment against the Defendant.

The Default already entered in this action against the Defendant is similar to a finding of liability against the Defendant.  See, *Almedia v. Secretary of Health Education of Welfare*, 622 F. 2d 1044 (1st Circuit 1980).  Accordingly, based upon the Default that has already entered against the Defendant, the Plaintiff has now proven the liability of the Defendant as to the matters set forth in the Plaintiff's pleadings.

## 2.  Analogous Case Law

The Plaintiff has moved forward for Default pursuant to 47 U.S.C. § 553, a provision of Title 47 that prohibits the unauthorized interception of television signals from the cable television system.  The telecommunications provisions of the United States Code also

contain the provision, 47 U.S.C. § 605, which prohibits the unauthorized utilization of interstate radio-originated communications. Section 605 is extremely similar to 47 U.S.C. § 553.

Both provisions essentially bar the unauthorized interception of television signals. Also, the statutory damage provisions for non-commercial defendants in § 605 and § 553 are extremely similar. In fact, the Second Circuit has held that where there is an unauthorized interception of signals from a coaxial cable, and the signals intercepted from the cable include interstate radio-originated communications, both §605 and §553 are violated. See *International Cablevision, Inc. v. Sykes* ("Sykes I"), 997 F. 2d 998, 1007 (2d Cir. 1993); *International Cablevision, Inc. v. Svkes* ("Sykes II"), 75 F.3d 123, 131 n.4 (2d Cir. 1996); but see *Charter v. Cintron* (and related Cases) 04-40064 FDS (D. Mass 2005) (a copy of the unpublished case is attached here as **"Exhibit A"**). In any event, even if § 605 might not apply for unauthorized cable television violations in the District of New Hampshire the cases decided pursuant to 47 U.S.C. § 605 are, at least, analogous or similar to §553 cases. Accordingly, the Plaintiff will make citations to § 605 cases simply as persuasive authority.

Also, in some of the cases cited in this Memorandum the defendants were using black market non-addressable descrambling devices to covertly descramble all of the cable company's signals. These descrambling devices are often referred to as "black boxes". In the case at bar one of the Plaintiff's legitimate converter/descramblers has been covertly modified by the Defendant or his agent to create a non-addressable descrambling device, in essence a home made black box. This descrambling device was then utilized for the unauthorized interception of the Plaintiff's signals. Therefore these "black box cases" are analogous to the claims in this Civil Action. Additionally, the Plaintiff cites to satellite television cases in this Memorandum wherein the defendants utilize satellite de-scrambling devices that are also similarly analogous to the homemade black box utilized by the Defendant in this Civil Action.

### 3. The Plaintiff's Case without the Default

Even without the Defendant's Default, the Plaintiff still has a strong case against the Defendant. Possession of a television descrambling device is sufficient evidence from which a trier of fact could infer that the device was used to descramble the Plaintiffs television signals. The decision in the Florida District Court case of *DirecTV. v. Miller*, Case no 6:03-cv-1027-Orl-19KRS (a copy of the unpublished case is attached hereto as "**Exhibit B**") supports this proposition. In the Miller case, the plaintiff, DIRECTV, had evidence that the defendant possessed a satellite television descrambling device called an "unlooper". The defendant in the *Miller* case moved for Summary Judgment against DIRECTV contending that DIRECTV lacked the necessary "direct evidence" such as eyewitness testimony or videotape of some wrongdoing. The Court rejected this argument stating:

> A reasonable jury could conclude that the defendant illegally stole DirecTV's programming. Based on their life experience, a jury could reasonably assume that people only buy electronic equipment such as televisions, computers, or (in the case of Defendant) satellite piracy unloopers when they plan to use such equipment. It would be a strange world, after all, if people regularly bought such equipment and then put it in the closet to collect dust. *Id* at 7

Moreover, the Defendant's actual possession of a television descrambling device leads to the reasonable inference that the device was used to descramble. In *Community Television Systems, Inc. v. Caruso*, 134 F. Supp. 2d 455 (D. Conn. 2000), *aff'd*, 224 F.2d 430 (2d Cir. 2002), there was evidence that the defendants purchased and installed cable television descramblers that would allow them to illegally view the plaintiff's cable television programming. *Id*. at 456. Although there was no so-called "direct" evidence that the defendants had ever actually used the devices the court, nonetheless, found the defendants liable for using the devices. After noting that the defendants had engaged in the transactions of obtaining descrambling devices from a distributor named "Radil" the court said:

> Based on the record here, the most reasonable inference is that each such transaction was engaged in with Radil so the descrambler could be used for its intended purpose, namely to receive cable services over TCI's system; there is no evidence of non-use or any other use. Thus, the court concludes that each of the

named defendants used and benefited financially from the descrambler sold by Radil, commencing in 1992 *Id*. at 460.

The Second Circuit affirmed the pertinent elements of the Connecticut District Court's liability decision in the *Caruso* case. In fact, the Second Circuit stated that the purchase and installation evidence was *"at least"* enough evidence for a rebuttable presumption of use. The court said:

> "In the pending case, the seller's computer records showed the names of [the defendants] and the devices were installed in their home. That evidence suffices to create *at least* a rebuttable presumption that each of them is liable." *Community Television Systems, Inc. v. Caruso*, 284 F.3d 430, at 432 (2nd Cir. 2002) ( emphasis added).

**4. Well Pled Facts Deemed Proven Upon Default**

The Default already entered in this action against the Defendant is similar to a finding of liability against the Defendant. See, *Almedia v. Secretary of Health Education of Welfare*, 622 F. 2d 1044 (1st Circuit 1980). Accordingly, based upon the Default that has already entered against the Defendant, the Plaintiff has now proven the liability of the Defendant as to the matters set forth in the Plaintiff's pleadings.

Accordingly, the Plaintiff has proven certain pertinent facts, including but not limited to the facts that:

   a. The Plaintiff has the legal franchise to sell cable television services in the Defendant's area;

   b. The Plaintiff distributes its cable television services to its subscribers utilizing scrambling technology such that a subscriber will receive descrambled (clear view) signals only for those services the subscriber is authorized to receive;

c.   On or before December 7, 2001  the Defendant or some third party, covertly
modified a certain Plaintiff issued decoder and thereby created an illegal,
unauthorized descrambling device;

d.   From on or before December 7, 2001, the Defendant utilized an unauthorized
descrambling device to receive and/or intercepted the Plaintiff's premium
cable channels and pay per view events without authorization and without
payment to the Plaintiff; and

e.   The Defendant's unauthorized interception of signal was done knowingly and
willfully.

Based upon these facts and others set forth in the Plaintiff's pleadings, the Defendant is
now liable to the Plaintiff for willful violations of Title 47 U.S.C. § 553(a).  Specifically, the
Defendant's actions violated §553(a)(1), which provides:

**No person shall intercept or receive or assist in intercepting or**

**receiving any communications services offered over a cable system,**

**unless specifically authorized to do so by a cable operator or as may**

**otherwise be specifically authorized by law.**

## II.    Damages

### 1. Damage Provisions and Remedy Provisions in Title 47 U.S.C. § 553(c)

Title 47 U.S.C. §553(c) provides civil damages and remedies to an aggrieved party from
a Defendant who has violated the above referenced §553(a) (1).  Various subsections of § 553 (c)
provide:

1.    The Court may grant a final injunction to prevent further violations of §553 (a)(1)
pursuant to 47 U.S.C. § 553 (c)(2)(A);

2.      The Court may grant recovery of full costs including awarding reasonable attorney's fees to the aggrieved party who prevails pursuant to 47 U.S.C. 553(c)(2)(C); and

3.      The Court may award actual damages or the Court may, at the Plaintiff's election, award statutory damages in a sum of not less than $250.00 or more than $10,000.00 as the court considers just, pursuant 47 U.S.C. § 553(c)(3)(A)(ii).

## 2. The Assessment of Statutory Damages

Although 47 U.S.C. §553(c) provides little guidance on the assessment of statutory damages, courts have used a variety of methods when assessing statutory damages including:

**(a) Estimating actual damages**, See *Comcast v Naranjo* 303 F. Supp. 2d 43 (D. Mass 2004) *Charter v Cintron* (and related Cases) 04-40064 FDS (D. Mass 2005) and *Cablevision v Lokshin*, 980 F. Supp. 107 (E.D.N.Y. 1997);

**(b) Assessing additional damages as a form of deterrence,** See *Time Warner v Domsky*, No. 96 Civ. 6851, 1997 U.S. Dist. LEXIS 13505 (S.D.N.Y. Sept. 2, 1997) (a copy of the unpublished decision is attached here to as **"Exhibit C"**), *DIRECTV v Getchel* 2004 WL 1202717 (D. Conn. 2004) (a copy of the unpublished decision is attached here to as **"Exhibit D"**) and *Cablevision v Collins* 2004 WL 1490307 (S.D.N.Y. 2004) (a copy of the unpublished decision is attached here to as **"Exhibit E"**).

## 3. The Estimate of Actual Damages

### A. Estimate of Actual Damages per month utilizing *reasonable inferences of use*.

By Affidavit the Plaintiff has asserted that:

a.   A particular converter/descrambler, bearing serial number CL79ABFTP, was issued to the Defendant on May 16, 1998;

b.   Converter/descrambler CL79ABFTP was returned to the Plaintiff by the Defendant on December 7, 2001;

c.   Shortly after Converter/descrambler CL79ABFTP (hereinafter the "device") was returned to the Plaintiff it was tested by the Plaintiff. The test proved, unequivocally, that the device had been modified to allow for the unauthorized interception of all the Plaintiff's premium channels and pay-per-view offerings;

d.   During the period of time the device was in possession of the Defendant she never ordered a single premium channel nor did she order pay-per-view offerings;

e.   Absent other evidence we can infer that the device was used for the unauthorized interception of signals from May, 1998 until December, 2001; this represents a 43 month period of time.

f.   An individual in possession of a descrambling device would still need to purchase some cable television signals from the Plaintiff in order to allow signals to enter the home and thereafter to be descrambled.

g.   Additionally, the non-premium cable television stations (e.g. MTV, The History Channel, etc.) are offered to subscribers in groupings of channels ("tiers"). These channels are either delivered in groups to the subscriber in a non-scrambled fashion or they are simply not delivered into the home at all. This also explains why an individual with a descrambling device might still be paying a significant amount to the cable television company while utilizing a descrambler to descramble the premium channels.   If an individual wanted

access to all stations that individual would have to pay to have the non-scrambled stations come into the home and then use the descrambling device to descramble the premium stations and pay-per-view offerings.

h.    During the above referenced 43 month period the pricing for standard service ("tiers") varied significantly but taking into account the length of time and the variations in price it is reasonable to state that Defendant was paying *on average* $37.76 per month for her service from the Plaintiff. This service did not include any scrambled premium stations.

i.    During the above referenced 43 month period the charge for all of the premium channels that would have been available to the Defendant through the use of the device varied significantly but taking into account the length of time and the variations in price it is reasonable to state that price *on average* was $56.24 per month. This $56.24 figure represents the value of the premium channels the Defendant had access to over and above the non premium stations she was actually paying for.

j.    During the above referenced 43 month period the charge for and the number of pay per view movie offerings that were accessible to the Defendant through the use of the device varied significantly but taking into account the length of time and the variations in price it is reasonable to state that price *on average* was $3.95 per movie and there were numerous movies offered per month.

k.    During the above referenced 43 month period the charge for and the number of adult pay per view movie offerings that were accessible to the Defendant through the use of the device varied significantly but taking into account the

length of time and the variations in price it is reasonable to state that price *on average* was $8.00 per movie and there were numerous movies offered per month.

l.    During the above referenced 43 month period the charge for and the number of special event pay per view offerings (e.g.; boxing or wrestling match) that were accessible to the Defendant through the use of the device varied significantly but taking into account the length of time and the variations in price it is reasonable to state that price *on average* was $30.00 per special event and, on average there was at least one special event per month.

In the case of *Comcast v Naranjo* 303 F. Supp. 2d 43 (D. Mass 2004) the Massachusetts Federal District Court estimated damages from the use of the modified converter/descrambler by making reasonable inferences of the amount of use of the device by the Defendant in that case. The Court in the *Naranjo* case found there where an individual had access to a similar descrambling device it was reasonable to infer some unauthorized interception based upon the use of the device. The *Naranjo* court found that it was that it was reasonable to infer that the monthly damages included:

a.    The cost of the premium channels the defendant had unauthorized access to each month ( this is the differential between what a defendant pays for service and the cost of all of the premium channels that they are able to obtain with the descrambling device);

b.    Ten (10) pay-per-view movies each month;

c.    Four (4) of the more expensive pay-per-view offerings.

Applying these numbers to the cost of the services during the pertinent time frame as set forth in the Affidavit of the Plaintiff an estimate of monthly damages based upon reasonable inferences of use would be:

| | |
|---|---|
| The value of the premium channels received over and above what the defendant was paying for basic services | $56.24 |
| The value of ten pay-per-view movies, | $39.50 |
| The value of four more expensive pay-per-view events, | $32.00 |
| Total damage per month | $127.74 |

## B. Estimate of Actual Damages per month utilizing *high-end purchaser* analysis

By Affidavit the Plaintiff has asserted that Comcast did an analysis of its legitimate, paying, legal subscribers in the region as to their pay-per-view purchasing in the month of February, 2003.   This analysis showed that a statistically significant number (.17%) of its legitimate, paying, high-end purchasers purchased fourteen (14) or more pay-per-view movies during that particular month.  Based upon these statistics the plaintiff asserts that if its high-end, legitimate, *paying,* legal customers purchase as many as fourteen or more paper views per month, it is clearly reasonable to infer that an individual like the Defendant who, when utilizing a descrambler (and not paying anything for pay-per-view offerings) would obtain at least as many pay-per-view movies per month as Comcast's legitimate high-end purchasers.

The cost of fourteen pay-per-view movies at the time in question was $55.30.  Adding this amount to the cost of the premium channels made available through the use of the descrambler ($56.24) there would be a reasonable estimate of monthly damages of at least $111.54.   Indeed, the monthly figure for this Defendant should be considerably higher because, while the Plaintiff's analysis dealt with pay-per-view movies, the descrambling device would

also allow the Defendant access to the more expensive pay-per-view offerings (e.g. adult offerings or sporting events). It is reasonable to infer that at least some monthly viewing by the Defendant would be of more expensive pay-per-view offerings.


### C. Estimate of number of months of unauthorized interception.

The court in the *Naranjo* case found that the estimated duration of the unauthorized interception began at the time when the defendant came into possession of the subject device *and* last ordered a premium channel or pay-per-view advent and concluded as of the date the device was returned to the plaintiff. In this civil action this Defendant never ordered a premium channel or pay-per-view while this particular converter descrambler was in her possession. From this information we can infer that the box was modified soon after it came into possession of the Defendant in May of 1998 and it was utilized until it was returned in December of 2001. This represents approximately 43 months of unauthorized interception.

### 4. Assessing Additional Damages as a form of Deterrence.

At least three separate cases where courts have *specifically added statutory damages for the purpose of deterrence.* See *Time Warner v Domsky*, No. 96 Civ. 6851, 1997 U.S. Dist. LEXIS 13505 (S.D.N.Y. Sept. 2, 1997), *DIRECTV v Getchel* 2004 WL 1202717 (D. Conn. 2004) and *Cablevision v Collins* 2004 WL 1490307 (S.D.N.Y. 2004).

The court in the *Domsky* case clearly set forth the deterrence reasoning when, after estimating the damage in a manner similar to *Naranjo* it said:

> While I find these amounts reasonably approximate the lost revenue from the use of a pirate box, it would not be sufficient deterrence if the damages payable by a violator were limited to the value of the stolen services. There would be no incentive to cease the violation if the penalty were merely the amount that should have been paid. *Id* at 18

The *Domsky* court then went on to double its estimate of damages as a form of deterrence when assessing the statutory damages.    This reasoning was recently explicitly followed in the *Collins* case where that court also doubled its estimate of damages as a form of deterrence when assessing statutory damages.

The Connecticut Federal District Court recently considered willfulness and deterrence when assessing statutory damages for the unauthorized interception of television signals in the case of *DIRECTV v Getchel,* 2004 WL 1202717 (D. Conn. 2004).  The court in the *Getchel case* cited to the case of *Cable/Home Communications corp.  v. Network Productions, Inc.,* 902 F. 2d 829, 852 (11th cir. 1990)  for the proposition that "In its broad discretion for determining statutory damages, the district court should consider both the willfulness of the defendant's conduct and the deterrent value of the sanction imposed." *Id* at 3.  The court then went on to assess statutory damages above the statutory minimum finding that the minimum would " have no deterrent effect" .  *Id* at 3.

In this civil action, the Defendant has defaulted to the specific allegations that the violations were made in a willful and knowing manner. The converter/descrambler was not modified to obtain unauthorized signals by accident.  Following the line of reasoning set forth in these cases, this court should double its estimate of actual damages or, at a minimum, the court should  make an assessment of damage significant enough to act as a deterrent and to take into account the willfulness of the violation.

## 5. Conclusion as to Statutory Damages

Based upon the statute, the arguments and the case law referenced above, statutory damages in this case could be assessed even higher than the $5,000.00 that is being sought by the Plaintiff.

### III.   Injunctive Relief

Based upon the Defendant's liability as determined by the Default, the Plaintiff is entitled to injunctive relief against the Defendant pursuant to Title 47 U.S.C. § 553 (c) (2)(A) which provides that the Court:

> "may grant temporary and final injunctions on such terms as it may
> deem reasonable to prevent or restrain violations of subsection (a)(1)
> of this section"

The Plaintiff need not prove irreparable harm for the injunction to issue. Where express authority for issuance of statutory injunctions is provided by legislative enactment, an injunction may issue without resort to the traditional "equitable" prerequisites so long as liability has been established under the statute. See *General Instrument Corp. v. Nu-Tek Electronics & Manufacturing, Inc.*, 3F. Supp 2d 602, 607 (E.D.Pa.1998), aff'd 197F.3d 83 (3d Cir.1999). The terms of the requested injunction are reasonably drafted to thwart any future piracy activities by the Defendant.

### IV.   Attorney's Fees

Pursuant to Title 47 U.S.C. 553(c)(2)(C), the Court should direct the recovery of full costs, including awarding reasonable attorneys fees to an aggrieved party who prevails. The First Circuit follows the "lodestar" approach when awarding attorney's fees pursuant to a Federal statutory authorization. See, *Furtado v. Bishop*, 635 F.2d 915, (1st Cir. 1980). Using the "lodestar" approach, the Court would normally multiply the number of hours worked by a reasonable hourly rate. Utilizing the "lodestar" approach, the Court would, in essence, multiply the reasonable number of hours worked by a reasonable hourly rate. Plaintiff's counsel has filed an Affidavit with this court that would justify an attorney's fees award of $523.00.

.

### V.    Post-judgment Interest

The Plaintiff is entitled to post-judgment interest accruing on the Judgment pursuant to 28 U.S.C. §1961.  Said statute covers post-judgment interest on civil actions brought to judgment in U.S. District Courts.

### VI.    Costs

The Plaintiff is also entitled to costs incurred in this action pursuant to § 553, specifically:

| | | |
|---|---|---|
| a. | Filing Fee ( including fee for out-of-state attorney): | $150.00 |
| b. | Sheriff's Service Fee: | $ 44.10 |

**TOTAL COSTS:**                                                                                    **$194.10**

### VII.    Conclusion

Pursuant to all of the above, the Plaintiff is entitled to a default judgment as follows:

1.      $5,000.00 in statutory damages pursuant to § 553;

2.      Attorney's and paralegal's fees of **$523.00**

3.      Costs of **$194.10**.

4.      The issuance of a permanent injunction pursuant to Title 47 §553 utilizing the following language or language of a similar nature:

> The Court hereby enjoins the Defendant, the Defendant's respective agents, servants, employees, and any person or entity controlled directly or indirectly by the Defendant or acting on the Defendant's behalf from the further modification and/or use of electronic equipment designed for the unauthorized interception of signal in violations of provisions of Title 47;

5.      Post-judgment interest running on the judgment pursuant to 26 U.S.C. § 1961.

Respectfully Submitted for the Plaintiff,
Comcast of Southern New England, Inc.
By Its Attorney,


4/25/05                     /s/ John M. McLaughlin
Date                     John M. McLaughlin
           **Green Miles Lipton & Fitz-Gibbon**
           77 Pleasant Street
           P.O. Box 210
           Northampton, MA 01061
           Telephone: (413) 586-0865
           BBO No. 556328

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

—————————————————————— )
CHARTER COMMUNICATIONS )
ENTERTAINMENT I, LLC d/b/a )
CHARTER COMMUNICATIONS, )
                  )      **Civil Action No.**
        v.               )      **04-40064-FDS**
                  )
INES CINTRON, Defendant. )
—————————————————————— )

—————————————————————— )
CHARTER COMMUNICATIONS )
ENTERTAINMENT I, LLC d/b/a )
CHARTER COMMUNICATIONS, )
                  )      **Civil Action No.**
        v.               )      **04-40081-FDS**
                  )
DENNIS SOSA, Defendant. )
—————————————————————— )

—————————————————————— )
CHARTER COMMUNICATIONS )
ENTERTAINMENT I, LLC d/b/a )
CHARTER COMMUNICATIONS, )
                  )      **Civil Action No.**
        v.               )      **04-40098-FDS**
                  )
THOMAS A/K/A TOM BURDULIS, )
          Defendant. )
—————————————————————— )

## MEMORANDUM ON PLAINTIFF'S MOTIONS FOR DEFAULT JUDGMENT

**SAYLOR, J.**

      The above-captioned cases involve virtually identical allegations of cable television piracy.

The cable operator, Charter Communications, has filed separate actions against three individuals,

all of whom are alleged to have purchased unauthorized devices to defeat scrambling or security

measures and thereby obtain premium cable television services for free. In each case, Charter has obtained an entry of default and has moved for a default judgment.

The issue in these cases is not the propriety of entering a judgment of default, but rather ascertaining the amount of damages to be assessed against the defaulting defendants. There are multiple levels of analysis that must be undertaken to accomplish that seemingly simple task. First, the Court must determine whether Charter is entitled to recover under not only 47 U.S.C. § 553, which applies to the theft of "cable" transmissions, but also 47 U.S.C. § 605, which applies to the theft of "radio" transmissions. The issue is not merely academic, as the latter statute provides for greater potential recovery of damages and recovery of costs and attorneys' fees as of right. The Court must then consider the amount of compensatory damages (either statutory or actual) to be awarded and the extent to which enhanced damages, attorneys' fees, costs, and injunctive relief should be awarded. To complicate matters further, the courts are in substantial disagreement as to many of the basic principles governing the resolution of those questions.

For the reasons set forth below, the Court concludes that § 553 applies to these cases, but not § 605; that any statutory damages should be a reasonable estimate of plaintiff's actual damages and should not include any component for punishment or deterrence; that the act of purchasing and installing a descrambling device is ordinarily sufficient to demonstrate "willful" conduct subject to enhanced damages; and that the use of a descrambler for home viewing of cable television programs is ordinarily sufficient to demonstrate that the act was committed for purposes of "private financial gain." The Court also finds that plaintiff is entitled to injunctive relief and an award of costs and reasonable attorneys' fees in each case.

## I. **Background**

The following facts are taken as true.[1] Charter is a cable operator that provides cable services to its customers. Compl. ¶ 7. Charter customers pay a monthly fee depending upon the level of service and amount of programming they select and purchase. Compl. ¶ 9. At all relevant times, Charter has offered basic cable channels, premium channels, such as Home Box Office, Cinemax, and Showtime, and pay-per-view channels for movies and special events. Compl. ¶ 11. Subscribers pay fixed monthly fees for access to basic cable channels and premium channels, and pay one-time charges for access to pay-per-view selections, which vary according to the particular program selected. Compl. ¶¶ 9, 18.

Although the complaints do not so specifically state, it appears that Charter receives radio signals sent via satellites by broadcasters and converts them into cable signals for delivery to subscribers. *See, e.g., United States v. Norris*, 88 F.3d 462, 467 (7th Cir. 1996). The cable signals are typically delivered by a coaxial cable directly to the subscriber's home. *Id.*

Charter's cable signals for premium channels and pay-per-view services are electronically coded or scrambled so that they must be decoded by electronic decoding equipment for the signals to be viewed clearly on a television receiver or monitor. Compl. ¶ 12. To decode the signals, Charter provides subscribers of these services with electronic decoding equipment referred to as converters. Compl. ¶ 13. Charter's converters are programmed from a central location to decode

---

[1] Because the defendants here all have been defaulted for failure to plead or otherwise defend, they are "taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability as to which damages will be calculated." *Ortiz-Gonzalez v. Fonovisa*, 277 F.3d 59, 62-63 (1st Cir. 2002) (quoting *Franco v. Selective Ins. Co.*, 184 F.3d 4, 9 n.3 (1st Cir. 1999)). Before entering the default judgments, the Court may examine the complaints, taking all well-pleaded factual allegations as true, to determine their legal sufficiency. *Ramos-Falcon v. Autoridad de Energia Electrica*, 301 F.3d 1, 2 (1st Cir. 2002); *Quirindongo Pacheco v. Rolon Morales*, 953 F.2d 15, 16 (1st Cir. 1992). For the sake of convenience, and unless otherwise noted, the Court will cite only to the Cintron complaint. The other complaints do not differ in material respects except where noted.

the signals and thereby enable the subscriber to view the purchased level of service.  Compl. ¶ 14.

Charter programs each of its converters specifically to permit the subscriber to view only the level

of service purchased.  *Id.*

To receive pay-per-view service, the subscriber's converter box must be addressable.

Compl. ¶ 16.  The subscriber either telephones Charter and requests to view the specific movie or

event or orders that movie or event using a remote control device.  Compl. ¶ 17.  Charter then

programs the addressable converter box to descramble that movie or event, enabling the subscriber

to receive a nonscrambled signal during the time of the broadcast.  *Id.*  The price of pay-per-view

movies or events varies but ranges from $3.95 for certain movies to approximately $49.95 for

certain sporting or other special events.  Compl. ¶ 18.  Charter subscribers are billed monthly for

pay-per-view movies and events ordered during the previous month.  *Id.*

Unauthorized decoders or descramblers are devices that have been designed or modified to

defeat the scrambling or addressable security functions of Charter's cable system.  Compl. ¶ 19.

Ordinarily, a person seeking to steal cable television signals will purchase the most basic service

available and use the illegal device to access premium services and pay-per-view movies and

events.  *See* Compl. ¶ 9.

In connection with *AT&T Broadband v. Modern Electronics*, *Inc.*, 8:03-00430 (D. Neb.

Sept. 17, 2002), Charter obtained business records of an entity called Modern Electronics.  Compl.

¶ 20.  Those business records indicate that each defendant here ordered and purchased from

Modern Electronics a cable theft device designed to effect the unauthorized reception of cable

programming.  Compl. ¶ 21.  Each defendant had also ordered only a particular level of service

from Charter for the relevant time period.  Compl. ¶ 8.

None of the defendants in the three cases answered or otherwise responded to the complaint. The clerk has entered a default in each case.

## II. Legal Analysis

### A. The Applicability of Sections 553 and 605

Charter contends that it is entitled to recover damages under both 47 U.S.C. § 553 and 47 U.S.C. § 605.[2] Although §§ 553 and 605 are similar in many respects, § 605 provides for a greater potential recovery of damages than § 553. Moreover, an award of costs and attorneys' fees is mandated for a violation of § 605, but such an award is discretionary as to a violation of § 553. Because any award of damages in this case will depend upon which provision of Title 47 applies, this Court must examine the applicability of both § 553 and § 605.

Section 553 provides that "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." 47 U.S.C. § 553(a)(1). There is no question that defendants' conduct subjects them to liability under § 553.

Section 605 provides that "[n]o person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." 47 U.S.C. § 605(a). Section 605 thus prohibits the unauthorized interception or

---

[2] Specifically, each motion for default judgment seeks the following relief: statutory damages in the amount of $20,000 for violations of 47 U.S.C. §§ 553(a) and 605(a); an order enjoining the defendant from "engaging in, aiding, abetting or otherwise promoting or supporting interception or reception of the cable television programming, service or signal of Charter"; and attorneys' fees and costs in the amount specified in an attached affidavit.

reception of *radio* communications.  Although Charter does not explain why defendants'

interception or reception of Charter *cable* transmissions violated § 605, cable operators in other

cases have theorized, as set forth below, that § 605 applies to such actions because the intercepted

cable transmissions previously had been transmitted to the cable operator via radio from satellites.

*See, e.g.*, *International Cablevision, Inc. v. Sykes*, 75 F.3d 123 (2d Cir. 1996) [*Sykes II*].

The First Circuit has not yet decided whether theft of cable services transmitted via wire

violates § 605, and the Courts of Appeals that have examined the issue are split.  *Compare Sykes

II*, 75 F.3d at 133 (concluding that unauthorized interception of cable transmissions violates both

§§ 553 and 605), *with Norris*, 88 F.3d at 469 (holding that theft of cable services does not violate

§ 605), *and TKR Cable Co. v. Cable City Corp.,* 267 F.3d 196, 197 (3d Cir. 2001) (same).

Reported decisions from District Courts in this circuit reveal a similar split.  *Compare

Century ML-Cable Corp. v. Diaz*, 39 F. Supp. 2d 121, 123-24 (D.P.R. 1999) (stating that both

§ 553 and § 605 prohibit the sale of illegal cable theft devices), *and United States v. Beale,* 681 F.

Supp. 74 (D. Me. 1988) (same), *with Kingvision Pay-Per-View, Ltd. v. Rocca*, 181 F. Supp. 2d 29

(D.N.H. 2002) (concluding that § 605 does not encompass cable theft), *and TCI Cablevision of

New Eng. v. Pier House Inn, Inc.*, 930 F. Supp. 727, 734 (D.R.I. 1996) (same).

For the reasons discussed below, the Court concludes that the defendants' actions do not

violate § 605.  The Court first will analyze the language and history of § 605 and then will examine

the reasoning of the courts in *Sykes II*, *Norris*, and *TKR Cable*.

"[T]he starting point for interpreting a statute is the language of the statute itself."

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980); *accord Arnold

v. United Parcel Serv., Inc.*, 136 F.3d 854, 857 (1st Cir. 1998).  As noted, Section 605 applies to

the interception of "any interstate or foreign communication by radio." 47 U.S.C. § 605(a). The

term "communication by radio" is defined under the statute to mean the "transmission by radio of .

. . signals . . . of all kinds . . . ." 47 U.S.C. § 153(33).[3]  Section 605 does not, however, refer to

the interception of a "communication by wire," which is also a defined term.  Section 153(52)

provides that "communication by wire" means transmission of "signals . . . of all kinds . . . by aid

of wire, cable, or other like connection."[4]  It thus seems obvious that § 605 was intended to apply

only to the interception of *radio* communications and not to the interception of *wire*

communications, which is defined to include *cable* transmissions.

　　　If this were a case of first impression, the Court would simply conclude that the language

of § 605 does not apply to the theft of cable services, without further inquiry.  *See Arnold*, 136

F.3d at 858 (observing that a district court need not consult other interpretive sources where a

statute's plain meaning is clear).  Nevertheless, this Court is not writing on a clean slate, and, as

---

[3]  The full definition is as follows:

The term "radio communication" or "communication by radio" means the transmission by radio of writings, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

47 U.S.C. § 153(33).


[4] The full definition is as follows:

The term "wire communication" or "communication by wire" means the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

47 U.S.C. § 153(52).

the courts that previously have considered the issue are split, the Court will address the issue in greater detail.

From the very onset of government regulation of radio broadcasting, Congress has drawn a clear distinction between radio transmissions and wire transmissions. *See Norris*, 88 F.3d at 464. The Communications Act of 1934, ch. 652, 48 Stat. 1064, now codified in relevant part at 47 U.S.C. § 605(a), established the Federal Communications Commission and granted the newly created commission jurisdiction over wire and radio transmissions. *Id.* at 464-65. In 1968, Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968 (Crime Control Act) to regulate the interception of wire and oral communications. Pub. L. No. 90-351, 82 Stat. 197. The Crime Control Act amended § 605, removing all references to wire communications except the first clause of § 605(a), which prohibited telecommunications personnel from publishing or divulging wire and radio transmissions. *Norris*, 88 F.3d at 465. After that amendment, § 605 generally continued to apply to "radio transmission[s]." *Id.*

The adoption of the Crime Control Act left a regulatory gap whereby theft of cable services, which involved a form of wire interception, was not explicitly covered in any statute or regulatory scheme. *Id.* To fill the gap, Congress eventually enacted 47 U.S.C. § 553(a) as part of the Cable Communications Policy Act of 1984, Pub. L. No. 98549, § 2, 98 Stat. 2779, 2796. *Id.* Section 553(a)(1) expressly prohibits the interception or unauthorized reception of "any communications service offered over a cable system."

That evolution of the statutory scheme reinforces the conclusion that is apparent from the text of the statute: Congress intended §§ 553 and 605 to address different types of interceptions. Nevertheless, the courts do not unanimously concur with that interpretation.

8

In *Sykes II*, the Second Circuit, the first Court of Appeals to face the question, held that distributors of cable theft devices are liable under both § 553 and § 605. The court reasoned that the devices ultimately are used to intercept radio communication, even if the radio communication is transmitted by cable at the point of interception. 75 F.3d at 131. The court acknowledged that Congress amended § 605 in 1968 to remove all references to wire communications and that this legislative action could be read as eliminating the applicability of § 605 to cable-television theft. *Id.* at 130. Nevertheless, the court rejected such an interpretation, relying on pre-1984 decisions applying § 605 to cable theft and a passage of the legislative history the court interpreted as adopting the reasoning of those decisions.

As the court in *Sykes II* observed, several District Court cases decided before the enactment of § 553 in 1984 had interpreted § 605 as affording protection to television signals transmitted via coaxial cable. 75 F.3d at 130-32 (describing such cases). These cases, the court stated, provided a "plausible interpretation" of the [pertinent portion] of § 605: "[t]he continued transmission of radio signals via cable after their receipt at the headend of a cable television system can be regarded as the 'receipt, forwarding, and delivery of [radio] communications . . . incidental to [the transmission]' of those communications within the meaning of § 153(b)." *Id.* at 131 (citing *Cablevision v. Annasonic Elec. Supply*, No. CV-83-5159 (E.D.N.Y. Feb. 10, 1984), *incorporated in Ciminelli v. Cablevision*, 583 F. Supp. 158, 164 (E.D.N.Y. 1984)).[5] As Congress is presumed

---

[5] One commentator casts doubt on these pre-1984 decisions as "probably making a virtue out of a necessity, as Section 605 had been drafted to cover over-the-air communications and did not address the particular issue of cable transmission." Daniel L. Brenner et al., *Cable Television and Other Nonbroadcast Video* § 5:84 (2004); *see also Norris*, 88 F.3d at 468 (describing the pre-1984 cases as attempts to "judicially fill the gap created by the [Crime Control Act] by extending § 605(a) to cover the interception of cable programming over a cable network"); *Pier House Inn*, 930 F. Supp. at 736 (questioning whether Congress should be deemed to have adopted the reasoning of the District Court cases cited in *Sykes II* because "[a] close reading of [those] cases . . . reveals that the issues raised varied in several important respects from those raised in both *Sykes II* and in this case.")

to have been aware of the District Courts' interpretation of § 605(a) and reenacted the statute without change, the court concluded that their interpretation may be deemed to have been adopted by Congress. *Id.*

The *Sykes II* court found this interpretation to be "strongly fortified" by a portion of the legislative history of § 553:

> [S]ection 605 of the Communications Act of 1934 includes a prohibition against the unauthorized reception of communications services. *Nothing in [§ 553] is intended to affect the applicability of existing Section 605 to theft of cable service, or any other remedies available under existing law for theft of service.* . . . [S]ituations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, *continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.*

*Id.* at 131-32 (quoting H.R.Rep. No. 934 at 83, *reprinted in* 1984 U.S.C.C.A.N. 4720 (emphasis added)). The court concluded that (1) the first emphasized passage indicated that § 605 would continue to apply to cable theft; and (2) the second emphasized passage established the exclusive applicability of § 605 to the interception of radio signals before they are retransmitted over a cable network but did not bar the section's application to cable theft. *Id.* at 132.

Just months after the opinion in *Sykes II*, the Seventh Circuit reached an opposite result, holding that cable-television programming transmitted over a cable network is *not* a radio communication actionable under § 605. *Norris*, 88 F.3d at 469.[6] The government offered two arguments as to why cable transmissions are "radio" communications: (1) because wire

---

[6] Although *Norris* was a criminal prosecution rather than a civil lawsuit, the applicable statutory language and analysis are the same in both contexts.

transmissions technically are radio waves delivered through a conducting cable, and (2) because a cable company's reception and forwarding of programming received as radio transmissions onto its cable network are "merely incidental" to the original radio transmissions. *Id.* at 467. The *Norris* court rejected both arguments. As to the former, the court stated that the argument "impermissibly conflates the definitions of wire and radio communications under Title 47— definitions which for over eighty years Congress has treated as distinct and mutually exclusive." *Id.* at 467. As to the latter, the court similarly noted that if it accepted the government's position, it would "unacceptably blur[]" the line between radio and wire communications. *Id.* at 467-68.[7] The *Norris* court also noted that the government's position would render much of the regulatory scheme "meaningless." *Id.* at 468.

After examining the statutory meaning of "wire" and "radio" communications, the court in *Norris* considered Congress's intent in enacting § 553. *Id.* at 468. The court reasoned that if Congress intended § 605 to cover the theft of satellite- and radio-originated cable transmissions, the only additional conduct covered by § 553 would be the theft of local cable programming that originates from the cable provider. *Id.* The court determined that, more logically, § 605 was meant to cover interceptions of programming traveling through the air, and § 553 was meant to cover interceptions of programming traveling over cable wire. *Id.* Finally, the *Norris* court concluded that the court in *Sykes II* had misinterpreted the legislative history of § 553 by taking passages out of context and assigning to them meanings at odds with the section's purpose. *Id.*

---

[7] The court also noted that cable companies not only route the radio and satellite transmissions over their cable networks but also combine the various transmissions, sort them into channels, and retransmit them over their own networks, actions that cannot be considered to be merely incidental to the original transmissions. *Id.*

Five years after *Norris*, the Third Circuit also held that § 605 does not apply to cable theft because it does not involve the interception of radio communications. *TKR Cable,* 267 F.3d at 197. In particular, the court agreed with the Seventh Circuit in *Norris* that if § 605 applied to all communications that were at one point transmitted via radio waves, Congress's excision of wire communication from § 605 in 1968 would be meaningless. *Id.* at 202.

The court in *TKR Cable* found support for its decision in the legislative history of § 553. *Id.* at 203. First, the impetus behind the creation of § 553 was the economic impact of the then-novel phenomenon of cable piracy. *Id.* Second, Congress knew when it enacted § 553 that much cable programming is delivered via satellite, and, therefore, it would not have engaged in extensive discussion of the large and economically significant problem of cable piracy if § 605 already addressed it (and if § 553 was meant to apply to local cable programming only). *Id.* at 205.[8]

The Court finds the reasoning of *Norris* and *TKR Cable* to be persuasive, and accordingly concludes that § 605 does not apply to theft of cable programming by a subscriber using a descrambler device. That conclusion is substantially more faithful to the statutory text, which distinguishes "service offered over a cable system," § 553(a), from "communication by radio," § 605(a). As both courts observed, if both § 553 and § 605 apply to theft of cable programming, the only additional conduct covered by § 553 is the theft of local cable programming; it seems extremely unlikely that Congress intended the statute to cover such a narrow range of conduct. Although legislative history should be considered with great caution, here the evidence is

---

[8] The authors of a cable treatise agree with *Norris* and *TKR Cable* that "[s]ection 605 should be read to govern when the piracy involves air-borne signals, including those on their way for retransmission by a cable operator . . . once the signals have been received at the head-end, though, any later theft should only involve Section 633 [47 U.S.C. § 553]." Brenner et al., *supra*.

12

overwhelming that Congress intended § 553 to address the serious, widespread problem of cable

piracy, not a microscopically small range of conduct.

That interpretation also comports with logic and common sense.  Unless the words are

completely disconnected from their ordinary meanings, a radio communication is simply not the

same thing as a cable communication, even though an electrical engineer might say that a cable

signal technically contains radio waves.  The change in the mode of transmission, by cable instead

of through the air, changes the applicability of the relevant statute.

For the reasons stated above, the Court concludes that § 605 does not apply to the theft of

communications transmissions over a cable wire.

### B.    **Compensatory Damages**

#### 1.    **Methodology for Determining Statutory Damages**

Having concluded that Charter may proceed only under 47 U.S.C. § 553, the Court next

must determine the amount of damages to which Charter is entitled in each case.

Section 553 permits the Court to award, among other things, either actual damages or

statutory damages to a successful plaintiff.  In relevant part, the section provides:

> Damages awarded by any court under this section shall be
> computed in accordance with either of the following clauses:
>
> (i) the party aggrieved may recover the actual damages suffered by
> him . . . or
>
> (ii) the party aggrieved may recover an award of statutory damages
> for all violations involved in the action, in a sum of not less than
> $250 or more than $10,0000 as the court considers just.

47 U.S.C. § 553(c)(3)(A). The statute provides no guidance as to the determination of statutory damages, leaving the matter to the Court's discretion. Charter seeks statutory damages in the amount of $10,000, the maximum permissible, for each defendant's violation of § 553.

In *Comcast of Massachusetts I, Inc. v. Naranjo*, Judge Keeton of this District addressed the problem of how to calculate statutory damages under § 553 in a case involving cable piracy for private home use. 303 F. Supp. 2d 43 (D. Mass. 2004). The cable provider had encouraged the court to consider a number of factors in calculating statutory damages, including "the willfulness of defendant's violation, the importance of 'general and specific' deterrence, defendant's cooperation with plaintiff, and actual damages in determining the appropriate award of statutory damages." *Id.* at 47. The court, however, rejected Comcast's factor-based analysis, concluding that statutory damages should be "as reasonable an estimate of actual damages as the facts . . . allow," not greater. *Id.*

The court observed that the plain language of § 553 provides that actual damages and statutory damages are "coordinate alternatives," with no difference or preference between them. *Id.* It also noted that the deterrent effect plaintiff sought to build into statutory damages actually was served by other subsections of § 553, which provide enhanced damages for willfulness and an injunction to prevent future violations. *Id.* at 48-49. Finally, the court explained that to build deterrence damages into statutory damages would lead to an absurd result:

> Under plaintiff's theory, an aggrieved party may receive as statutory damages premiums to deter future conduct in addition to actual or estimated actual damages. Statutory damages, however, may not exceed $10,000. As a result, parties that have suffered large actual damages (greater than $10,000) cannot receive deterrence premiums. But if any violators require an additional deterrence premium, it is those who have caused the largest amounts of harm.

14

*Id.* at 49.  Accordingly, the court concluded that it should award as statutory damages as reasonable an estimate of actual damages as the facts would allow.  *Id.*

To arrive at that estimate, the court took the monthly charge for the premium cable service defendant was receiving illegally and subtracted from it the amount defendant paid for basic cable service.  The court then considered the cost of pay-per-view programming.  It observed:

> Plaintiff offers no reasonable estimate of damages, stating only that the cost of all services could total over $500 a month.  But no defendant could partake of all the cable services made available by the illegal descrambler, nor do I find it plausible that a defendant would order pay-per-view services 24 hours a day, every day of the month.

*Id.*  Independently, then, the court determined that ten pay-per-view movies and four "additional pay-per-view selections" per month were reasonable and added the cost of these services to arrive at a total estimated monthly figure.[9]  Finally, it multiplied by the number of months cable was intercepted to arrive at a statutory damage amount of $2,780.  *Id.*

The approach used by other courts has varied widely.  Some courts have used statutory damages to approximate actual damages, as in *Naranjo*, but also included additional sums to deter future violations, the approach that *Naranjo* rejected.  *See, e.g.*, *Rosa*, 2002 WL 1446942, at *5 (opining that damages should be calculated to deter future misconduct and to avoid granting defendants a windfall); *Joe Hand Promos., Inc. v. Salinetti*, 148 F. Supp. 2d 119, 120-23 (D. Mass. 2001) (multiplying approximate actual damages by five to reach statutory damages, reasoning that the defendants should pay more than just restitution costs); *Mountain Cable Co. v.*

---

[9] Compare *Cablevision Systems New York City Corp. v. Rosa*, where the court concluded that one special event and seven pay-per-view movies per month were reasonable given the "limitations that taste, viewing preference, programming selection and time placed on [defendant's] viewing."  2002 WL 1446942, at *5 (S.D.N.Y. 2002).  The court acknowledged that any estimate of the value of the pay-per-view programming that defendant intercepted would be somewhat arbitrary.  *Id.*

*Choquette,* 53 F. Supp. 2d 107, 112 (D. Mass. 1999) (awarding $3,000 in statutory damages where a landlord distributed illegally intercepted cable to two apartment units and his own residence, noting that the sum reflected the "seriousness of defendant's violation balanced against the relatively small scale of his illegal activity").

Other courts have awarded a flat sum rather than attempting to approximate actual damages. Some courts have awarded the statutory maximum where the defendants have defaulted, failed to contest damages, showed willful conduct, or stole services valued near the maximum damage award. *See, e.g.*, *Community Television Sys., Inc. v. Caruso*, 134 F. Supp. 2d 455, 460-01 (D. Conn. 2000) (awarding $10,000, the maximum damages under § 605, where defendant made it as difficult as possible for the plaintiff to vindicate its rights); *Cablevision Sys. N.Y. City Corp. v. Lokshin*, 980 F. Supp. 107, 113 (E.D.N.Y. 1997) (awarding the maximum damages of $10,000 because plaintiff's reasonable estimate of the value of programming defendant received over six years was $9,000).[10]

Some courts have decreased damage awards when the defendant cooperated by surrendering unauthorized devices. *See Charter Communications Entm't I, LLC v. Shaw,* 163 F. Supp. 2d 121, 125 (D. Conn. 2001). Some have decreased awards on the grounds that the defendant's offense was considered minor. *See Kingvision Pay-Per-View v. Langthorne,* 2001 WL 1609366, at *1 (D. Mass. 2001) (awarding the statutory minimum in "a case involving a single unauthorized broadcast . . . by one small establishment that did not even charge its patrons a

---

[10] Still other courts have awarded flat sums without revealing their reasoning. *See*, *e.g.*, *Diaz*, 39 F. Supp. 2d at 125 (stating that $10,000, the maximum damages under § 553 and the minimum under § 605, for each of 750 violations, was a "just figure"); *Pier House Inn*, 930 F. Supp. at 737 (awarding $5,000 in statutory damages for a violation of § 553); *Cablevision Sys. Corp. v. Muneyyirci*, 876 F. Supp. 415 (E.D.N.Y. 1994) (awarding the statutory minimum per sale for 390 violations).

16

cover"); *Time Warner Cable of N.Y. City v. Barnes*, 13 F. Supp. 2d 543, 548 (S.D.N.Y. 1998) (awarding the statutory minimum of $1,000 when the defendant purchased a single cable theft device); *Time Warner Cable of N.Y. City v. Olmo*, 977 F. Supp. 585 (S.D.N.Y. 1997) (awarding the statutory minimum for each sale where the defendant sold only two cable theft devices).

This Court is persuaded that Judge Keeton's approach in *Naranjo* best satisfies the command of the statute and the judicial interest in promoting predictability and transparency. As Judge Keeton observed, statutory damages should be a reasonable estimate of actual damages; any deterrent effect should be created through an award of enhanced damages and attorneys' fees, not by inflating compensatory damages. The Court will therefore apply the approximation method rather than the flat-sum method, and limit statutory damages to a reasonable approximation of actual damages without a deterrence premium.

There remains the troublesome question of where to set the statutory damage amount. As in *Naranjo*, Charter has estimated its actual damages by claiming the amount of pay-per-view service defendants potentially *could* watch, rather than the amount a reasonable or average viewer, even one receiving service for free, *would* watch. Even in an era where the number of hours spent by the average American watching television has reached staggering proportions, there are, nonetheless, practical limits. Those who steal cable television presumably must sleep, eat, bathe, go to work, shop, and otherwise go about their daily lives. When they watch television, some of the time they presumably spend watching basic cable (for which they have paid) and premium cable (which they are stealing, but which is sold at a fixed monthly price). It is only, then, the amount of the additional stolen pay-per-view signals that the Court must attempt to estimate.

17

Charter has not submitted any evidence to assist the Court in this determination—for example, evidence, expert or otherwise, as to the viewership habits of the average cable subscriber or the average pay-per-view subscriber, or as to the impact on pay-per-view usage when the service is provided for free. The Court is thus left to estimate such viewership without any guideposts, or even a base point from which to begin. In the absence of such evidence, the Court will simply adopt the assumptions of Judge Keeton: the Court finds that ten pay-per-view movies at standard rates and four "additional pay-per-view selections" at higher rates per month is a reasonable estimate. It will therefore add the cost of these services to arrive at a total estimated monthly figure.[11] In addition to appearing to be plausible on its face, that approach has the virtue of consistency between two sessions of the same court. Should Charter, in a future case, come forward with evidence suggesting that the figure is too low or too high, the Court may revise its estimate accordingly.

### 2.    Amount of Statutory Damages

#### a.    Cintron

Charter seeks damages against Cintron for a 51-month period dating from April 2000 to July 2004.[12] Charter alleges that the cost of illegally intercepted premium programming for that

---

[11] According to Charter, standard pay-per-view movies cost $3.99; adult pay-per-view movies cost $6.99; and the company occasionally airs special pay-per-view events at prices between $5.95 and $59.95. Judge Keeton awarded Comcast damages for four "additional pay-per-view selections" at the adult-movie price, without distinguishing between adult movies and special events or estimating a separate number of pay-per-view special events. *See Naranjo*, 303 F. Supp. 2d at 49. That result is somewhat arbitrary, but reasonable in light of the fact that Charter, which has the burden or proving its damages, has not provided any information about the price, frequency, or viewership of special events actually made available during the relevant time period.

[12] Charter seeks damages from Cintron for the period April 2000 through July 2004, which is either 50, 51, or 52 months, depending upon the starting and ending dates of the calculation. Although Charter describes that period variously as "approximately four years and three months [i.e., 51 months]" and as "50 months," the Court has treated it as 51 months.

period was $40 per month ($10 each for The Movie Channel, Showtime, HBO, and Cinemax), for a total of $2,000 for the entire period. Additionally, as explained above, Charter will be awarded damages for ten pay-per-view movies per month at $3.99 each and four additional pay-per-view movies per month at $6.99 each, for a total of $3,393 in illegally intercepted pay-per-view programming for the entire 50-month period. Therefore, Cintron will be ordered to pay $5,393 in statutory damages.

### b.    Sosa

Charter seeks damages against Sosa for a 48-month period dating from August 2000 to August 2004. Charter alleges that the cost of illegally intercepted premium programming for that period was $40 per month ($10 each for The Movie Channel, Showtime, HBO, and Cinemax), for a total of $1,920 for the entire period. Additionally, as explained above, Charter will be awarded damages for ten pay-per-view movies per month at $3.99 each and four additional pay-per-view movies per month at $6.99 each, for a total of $3,257.28 in illegally intercepted pay-per-view programming for the entire 48-month period. Therefore, Sosa will be ordered to pay $5,177.28 in statutory damages.

### c.    Burdulis

Charter seeks damages against Burdulis for a 48-month period dating from August 2000 to August 2004. Charter alleges that the cost of illegally intercepted premium programming for that period was $40 per month ($10 each for The Movie Channel, Showtime, HBO, and Cinemax), for a total of $1,920 for the entire period. Additionally, as explained above, Charter will be awarded damages for ten pay-per-view movies per month at $3.99 each and four additional pay-per-view movies per month at $6.99 each, for a total of $3,257.28 in illegally intercepted pay-per-view

19

programming for the entire 48-month period.  Therefore, Burdulis will be ordered to pay $5,177.28 in statutory damages.

### C.    **Enhanced Damages**

In addition to compensatory damages, Charter seeks enhanced damages under the statute. Section 553(c)(3)(B) provides for enhanced damages of up to an additional $50,000 where the "court finds that the violation was committed willfully and for purposes of commercial advantage or private financial gain."  Two findings—willfulness *and* either commercial advantage or private financial gain—are thus required.

### 1.    **Willfulness**

The term "willful" is not defined in the statute.  It has been defined in the context of alleged Cable Act violations as "a disregard for the governing statute and an indifference to its requirements."  *Cable/Home Communication Corp. v. Network Prods., Inc.*, 902 F.2d 829, 851 (11th Cir. 1990).

Courts generally have been imprecise in assessing willfulness, often assuming it rather than finding it in any reasoned way.  This tendency may be due to the nature of the violation:  even garden-variety cable piracy (i.e., purchasing and hooking up an unauthorized device) could be considered willful because it requires affirmative illegal steps to be taken.  As one court noted, "Signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems."  *Time Warner Cable of N.Y. City v. Googies Luncheonette, Inc.*, 77 F. Supp. 2d 485, 490-91 (S.D.N.Y. 1999), *quoted in Salinetti*, 148 F. Supp. 2d at 123.[13]  The Court agrees

---

[13] *See also King Vision Pay-Per-View Corp., Ltd. v. Tardes Calenas Moscoro, Inc.*, 2004 WL 473306, at *4 (S.D.N.Y. 2004) ("In order for [defendant] to access the telecast, it would have been necessary to use an unauthorized decoder, to make misrepresentations identifying [defendant] as a residential customer, or to illegally

that, in the ordinary case, the act of acquiring and installing a descrambling device is sufficient to demonstrate a willful violation. But there nonetheless must be a distinction between willful and non-willful violations, or the term "willful" has no meaning.[14]

Some courts have gone further and concluded that defendant's default in the litigation is itself evidence of willfulness. *See, e.g., Salinetti*, 148 F. Supp. 2d at 122 (citing *Olmo*, 977 F. Supp at 589 ("[T]he court may draw an inference of wilfulness from a defendant's failure to appear and defend an action in which the plaintiff demands increased statutory damages based on allegations of willful conduct.")); *see also Rosa*, 2002 WL 1446942, at *5 (concluding defendant's default, among other things, demonstrated a willful disregard for the Cable Act); *Diaz*, 39 F. Supp. 2d at 125 ("[D]efendant's civil contempt and default alone may be viewed as evidence of willfulness."); *Lokshin*, 980 F. Supp. at 114 ("[The] default itself could further be viewed as evidence of willfulness."). *But see Langthorne*, 2001 WL 1609366, at *1 (inferring willfulness from a defendant's default alone is "extremely problematic") (citing *Entertainment by J & J, Inc. v. Perez*, 2000 WL 890819, at *2 (N.D. Cal. 2000) (holding that the mere assertion that a defaulted defendant acted willfully was insufficient to justify enhanced damages)); *Kingivision Pay-Per-*

---

divert cable service or satellite signals. . . .The illegality of any of these actions would have been apparent to the perpetrator."); *Kingvision Pay-Per-View, Ltd. v. Recio*, 2003 WL 21383826, at *5 (S.D.N.Y. 2003) ("[T]he defendants' actions were willful since they each took an affirmative action to illegally intercept [the] broadcast."); *Kingvision Pay-Per-View, Ltd. v. Jasper Grocery*, 152 F. Supp. 2d 438, 442 (S.D.N.Y. 2001) (finding willfulness because "to access the telecast, it would have been necessary to use an unauthorized decoder, to illegally divert cable service into the store, or improperly relocate an authorized decoder[,] . . . the illegality of [which] would have been apparent to the perpetrator."); *Lokshin*, 980 F. Supp. at 114 (concluding defendant's "conduct undoubtedly was willful since he took measures to purchase and install an unauthorized descrambler").

[14] In other words, the statute necessarily proscribes other types of conduct that are not "willful," or the distinction is meaningless. An example of a possible non-willful violation would be a situation in which an adult child gave a descrambler to his unsophisticated elderly parent and told the parent that he was paying all relevant charges to the cable company. The parent would thus be unlawfully receiving cable transmissions, but under circumstances that were not "willful."

*View, Ltd. v. Arias*, 2000 WL 20973, at *2 (N.D. Cal. 2000) (concluding that allegations of willfulness alone were insufficient to support finding of willfulness against defaulted defendant).

This Court does not agree that the act of defaulting is relevant to the willfulness finding. A finding that default is relevant implicitly suggests that the defendant is somehow contumaciously defying the plaintiff and the Court, similar to a criminal defendant who flees the jurisdiction rather than face prosecution. This view places far too much weight on an event that is nearly always ambiguous. There are many reasons why a defendant might default in a civil case—for example, because the defendant had moved away and the plaintiff could not locate him; because the defendant had no money for counsel and was not aware of his right to proceed *pro se*; or because the defendant did not speak English and did not understand the nature of the papers served upon him. Furthermore, unlike the flight of an accused criminal, a civil default imposes no particular hardship on the plaintiff or the Court. The plaintiff is not required to devote substantial resources to litigation, incurs no litigation risk, and generally obtains a very favorable judgment with little effort. Although plaintiff loses the opportunity to take discovery from the defendant, the availability of statutory damages makes that issue relatively insignificant. Also, while it is true that the plaintiff must find the defendant to enforce its default judgment, that is significant only where the defendant would be able to pay it; it seems highly probable that the great majority of defaulting defendants do not have meaningful assets with which to pay a judgment.

In any event, the Court finds that, under ordinary circumstances, the acts of purchasing a descrambler and installing it are sufficient, standing alone, to demonstrate willfulness. A descrambler has no legal use, and it would be unusual, to say the least, for a person to use such a

device non-willfully.  The allegations in the complaints therefore satisfy the first element of the

standard for enhanced damages under 47 U.S.C. § 553(c)(3)(B).

### 2.    Private Financial Gain

The second element that must be established for enhanced damages is that the violation was

committed "for purposes of commercial advantage or private financial gain."  47 U.S.C.

§ 553(c)(3)(B).  There is no issue in these cases of commercial advantage, so the question

becomes whether the violations were committed for private financial gain.

Like the term "willful," the phrase "private financial gain" is not defined in § 553.  In

pertinent part, § 553 provides:

> In any case in which the court finds that the violation was
> committed willfully and for purposes of commercial advantage or
> private financial gain, the court in its discretion may increase the
> award of damages.

*Id.*  By way of comparison, an almost identical provision is found in § 605:

> In any case in which the court finds that the violation was
> committed willfully and for purposes of direct or indirect
> commercial advantage or private financial gain, the court in its
> discretion may increase the award of damages.

47 U.S.C. § 605(e)(3)(C)(ii).  Section 605, however, goes on to restrict the term "private financial

gain" as follows:

> [T]he term "private financial gain" *shall not include* the gain
> resulting to any individual for the private use in such individual's
> dwelling unit of any programming for which the individual has not
> obtained authorization for that use.

47 U.S.C. § 605(d)(5) (emphasis added).  Section 553, enacted after § 605, contains no such

restriction.  It seems clear, as evidenced by the difference in the statutes, Congress intended to

exclude from the definition of "private financial gain" the gain resulting from an individual's private

23

home use in § 605, but not in § 553.  As a consequence, the gain resulting from an individual's private home use *does* constitute "private financial gain" under § 553.

There is little case law discussing this point; what exists reveals two opposing views from the Eastern District of New York.

In *American Cablevision of Queens v. McGinn*, 817 F. Supp. 317, 320 (E.D.N.Y. 1993), the court declined to award enhanced damages where the defendant illegally modified his cable box on the grounds that such conduct did not constitute "private financial gain."  Although the court did not discuss the differences between §§ 553 and 605, the court observed that anyone who uses a device to obtain cable illegally is reaping "private financial gain."  *Id.*  But the court reasoned that if this interpretation were correct, there would be no reason for a separate section to enhance damages for violations for "private financial gain," because all violations would be enhanced.  *Id.*; *see also Time Warner Cable of N.Y. v. Rivera*, 1995 WL 362429, at *4 (E.D.N.Y. 1995) (following *McGinn* in refusing to award enhanced damages for "private financial gain" where defendant tampered with her home cable box).

The court in *Lokshin,* by contrast, focused on the fact that § 605(d)(5) specifically excludes from the definition of "private financial gain" any unauthorized private home use, but § 553(c)(3)(B) contains no parallel exclusion.  980 F. Supp. at 112.  The court concluded that in the absence of such a qualification in § 553, the plain statutory meaning of "private financial gain" includes unauthorized private home use.  *Id.* at 114.  Accordingly, the court considered Lokshin's savings in cable fees to be "private financial gain" under § 553 and awarded enhanced damages.

*Id.* at 115; *see also Rosa*, 2002 WL 1446942, at *5 (awarding enhanced damages against a defendant for his unauthorized private use at home).[15]

The Court agrees with the reasoning of the *Lokshin* court. An individual's use of a descrambler to obtain cable programming without paying for it constitutes "private financial gain" within the meaning of the statute, absent unusual circumstances not apparently present here. The plain meaning of "private financial gain" and the fact that Congress excluded private home use from the definition of the phrase in § 605, but not § 553, both strongly support that conclusion.

That interpretation is potentially problematic only because it is so broad that many or most violations of § 553 would be subject to an award of enhanced damages. This result appears to be consistent with the statutory scheme, however. Because statutory damages should approximate actual damages with no deterrence premium, most, if not virtually all, violations *should* be subject to enhancement for deterrence purposes.[16]

Because both elements for enhanced damages have been established under § 553, the issue then becomes determining the amount of the award.

---

[15] The *McGinn* court had found that "private financial gain" under § 553 applies only when the defendant sells an illegal device or intercepts a signal for a public showing. 817 F. Supp at 320. The *Lokshin* court rejected that argument as inconsistent with the plain meaning of the statute, and similarly rejected the argument that such a reading of § 553 would subsume all conduct that violated the statute. 980 F. Supp at 114. The court provided two examples of violations of § 553 without "private financial gain": (1) an individual who assists in the installation of an unauthorized device, triggering § 553(a), but who does not receive any compensation, and (2) a manufacturer who attempts to distribute illegal cable theft devices but is apprehended before making its first sale. *Id.*

[16] For this interpretation to be completely coherent, there must exist a category of violations that are willful but not undertaken for either "commercial advantage" or "private financial gain." The *Lokshin* court provided two examples, set forth in footnote 14 above. A third possible example would be a person who purchases and installs a descrambler for the benefit of disabled children at an orphanage; the person has committed a willful violation, but presumably has obtained neither commercial advantage nor private financial gain from the transaction, only personal satisfaction.

### 3.    Methodology for Determining Enhanced Damages

The courts are also in disagreement as to how to determine the amount of any enhanced damages.  Some courts have awarded minimal enhanced damages where the violation was relatively small in scale.  *See*, *e.g.*, *Olmo,* 977 F. Supp at 590 (awarding $1,000 in enhanced damages for two offenses based on the small scale of the unauthorized modification scheme).[17]  At the other extreme, some courts have awarded the maximum amount of enhanced damages where the defendant was in the business of selling descrambling devices.  *See*, *e.g.*, *Time Warner Entm't/Advance-Newhouse P'ship v. Worldwide Elecs., L.C.*, 50 F. Supp. 2d 1288, 1301-02 (S.D. Fla. 1999) (awarding $50,000 in enhanced damages, the maximum under § 553, based on defendants' business of selling descrambling devices with full knowledge of its illegality).[18]

---

[17] Some courts have awarded relatively minimal enhanced damages even where there are multiple violations.  *See*, *e.g.*, *Diaz,* 39 F. Supp. 2d at 125 (awarding $100,000 for defendants' willful sale of 750 illegal devices, or $133 for each violation, despite the fact that the maximum damages was $100,000 for each willful violation); *Lokshin*, 980 F. Supp. at 115 (awarding $1,500 in enhanced damages for a six-year violation where the services already received by defendant were near the statutory maximum).

[18] In *Entertainment by J & J, Inc. v. Friends II, Inc*, which involved the unauthorized interception and broadcast of a boxing match telecast by a bar, the court listed the following factors to be considered in awarding enhanced damages for willfulness: (1) repeated violations over time, (2) substantial monetary gains, (3) significant actual damages, (4) advertising for the stolen programming, and (5) charging a cover or a premium for drinks or food.  2003 WL 1990414, at *4 (S.D.N.Y. 2003).  There, the court awarded $3,000 in enhanced damages for willfulness explaining that, although the defendants had charged a cover, there were only 35 patrons present and only two small televisions showing the match.  *Id.*

But even where commercial establishments are involved, the amount of enhanced damages awarded varies considerably.  *Compare Friends II* (awarding $3,000 for a single violation); *Recio*, 2003 WL 21383826, at *5 (awarding $2,000 for a single violation where defendant profited from selling food and drink); *Choquette,* 53 F. Supp. 2d at 113 (awarding $3,000 where free cable service was offered to tenants and the defendant therefore theoretically was able to charge them higher rent for this inclusion); *and Entertainment by J & J, Inc. v. Nina's Rest. & Catering*, 2002 WL 1000286, at *3 (S.D.N.Y. 2002) (awarding $2,500 for single violation), *with Jasper Grocery,* 152 F. Supp. 2d at 442 (awarding $10,000 despite lack of evidence of repeated violations or substantial monetary gains by the defendant), *and Pete*, 1999 WL 638215 at *2 (awarding $5,000 in for a single violation to deter future piracy of pay-per-view events even though defendant did not charge a cover and there were only 8 patrons present).

Overall, the amount of enhanced damages that have been awarded by the courts appears to be somewhat arbitrary and, for the most part, not based on any specific articulated factors. Courts obviously tend to award low enhanced damages for single violations by individual subscribers, but the amount awarded appears to be largely arbitrary. To maintain some semblance of consistency with the case law in this circuit, the Court will adopt the position that a $1,000 enhanced damages penalty is the presumptively correct amount for single violations by individual subscribers. *See Salinetti*, 148 F. Supp. 2d at 123 (adding $2,500 in enhanced damages where a club illegally exhibited a boxing match to patrons; concluding that such conduct was not particularly egregious); *Choquette*, 53 F. Supp. 2d at 113 (awarding enhanced damages of $3,000 where, over the course of several years, a landlord distributed illegally intercepted cable service to his tenants as part of their rent); *Pier House Inn*, 930 F. Supp. at 737 (enhancing damages by $5,000 where a hotel illegally intercepted cable service and blatantly advertised that it offered free cable in order to obtain a competitive advantage over other lodging places).

### D.    <u>Injunctive Relief</u>

Injunctive relief is available under § 553(c)(2)(A), which provides that the Court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a)(1) of this section." Courts routinely enter injunctions preventing defendants from illegally intercepting cable. *See e.g.*, *Naranjo*, 303 F. Supp. 2d at 50. *But see Smith*, 141 F. Supp. 2d at 287-88 (refusing to issue injunction because plaintiff failed to establish irreparable harm and admitted to the court that it wanted an injunction so it could expose plaintiff to contempt sanctions). Accordingly, Charter will be granted statutory injunctive relief against each defendant here.

### E.    Costs

Section 553(c)(2)(C) authorizes the court in its discretion to "direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." In each of the cases before the Court, Charter has requested the costs of the filing fee and deputy sheriff's fee for service of the summons and complaint, as set forth in an attached affidavit. Accordingly, Charter will be awarded costs as follows: against Cintron, $198.94; against Sosa, $204.20; and against Burdulis, $204.20.

### F.    Attorneys' Fees

#### 1.    Methodology for Determining Attorneys' Fees

As noted, section 553(c)(2)(C) also authorizes the court in its discretion to award reasonable attorneys' fees to a prevailing party. "Given the burden borne by cable operators to protect and redress their statutory rights through civil actions from what is also criminal conduct," it is appropriate to award attorneys' fees in these cases. *Diaz*, 39 F. Supp. 2d at 126.

The First Circuit follows "the 'lodestar' approach, which calculates reasonable attorneys' fees as 'the number of hours reasonably expended multiplied by a reasonable hourly rate.'" *Naranjo*, 303 F. Supp. 2d at 50 (quoting *Furtado v. Bishop*, 635 F.2d 915, 920 (1st Cir. 1980)). A reasonable hourly rate is measured according to the prevailing market rates in the relevant community and by considering factors such as "'the type of work performed, who performed it, the expertise that is required, and when it was undertaken.'" *Choquette*, 53 F. Supp. 2d at 114 (quoting *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 951 (1st Cir. 1984)). To determine the number of hours reasonably spent, the Court must subtract from the number of hours actually spent "'hours which were duplicative, unproductive, excessive, or otherwise unnecessary.'" *Id.*

(quoting *Grendel's Den*, 749 F.2d at 950). This figure represents the lodestar; the Court may adjust the lodestar upward or downward to reflect other factors, including the result obtained. *Id.* at 114-15 (citing *Grendel's Den*, 749 F.2d at 951). "The First Circuit considers three meanings of the term 'results obtained': plaintiff's success on each claim, relief actually achieved, and the societal importance of the right which has been vindicated." *Id.* at 116.

At least two factors particular to these cases may affect the amount of attorneys' fees to be awarded from the amounts requested by plaintiffs.

First, it appears from the cases currently before the Court that Charter has filed multiple, largely identical lawsuits, corresponding to information it received from a raid on a distributor. Although counsel have filed nearly identical complaints, affidavits, and motions for each defendant, counsel have not specifically acknowledged the duplicative nature of the work in their billing. One would expect that the first case to be investigated, researched, and filed would bear the lion's share of the legal expenses, and that each additional similar case would involve substantially less effort by the attorneys. Counsel instead seeks largely identical fees for each case. It is not possible to tell from the record whether the time commitment has in fact been identical, whether the attorneys have attempted to allocate their legal fees to spread the cost of the litigation across all cases equally, or whether the fees otherwise have been adjusted.

Second, Charter requested relief under 47 U.S.C. § 605, which, as explained above, does not apply to cable piracy. The Court may consider this fact in assessing the result obtained in these cases and whether there should be a corresponding downward departure from the lodestar.

Nonetheless, Congress has clearly stated that successful plaintiffs are to be awarded their attorneys' fees. The Court recognizes that, given the relatively low damage awards involved in

cable-piracy cases, injured cable operators might not be inclined to vindicate their statutory rights if attorneys' fees were not available. Accordingly, the Court will grant Charter reasonable attorneys' fees in these cases, upon fulfillment of the conditions set forth below.

### 2.    Amount of Attorneys' Fees

Counsel for Charter have not provided the Court sufficient information with which to calculate reasonable awards of attorneys' fees in these cases. In particular, the Court requires further information about the allocation of legal expenses across largely identical lawsuits in multiple cases. Counsel should also identify what portion of the legal fees involved research or preparation of claims brought under 47 U.S.C. § 605 as opposed to § 553. Accordingly, counsel are directed to submit within 21 days a further sworn statement regarding attorneys' fees in these cases, at which time the Court will enter appropriate awards of attorneys' fees.

### Conclusion

Upon receipt and review of counsel's further statement regarding attorneys' fees, the Court will enter orders in the individual cases consistent with this memorandum, and judgment shall enter in favor of Charter.

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: January 11, 2005

30

R6 1589|031688

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

7'03 NOV 20  PM 1: 02

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO. FLORIDA

DIRECTV, INC.,

Plaintiff,

-vs-

Case No.  6:03-cv-1027-Orl-19KRS

DALE MILLER,

Defendant.

## ORDER

This case comes before the Court on the following:

1.    Defendant's Motion for Summary Judgment.  Doc. No. 21.

2.    Memorandum in Support of Motion for Summary Judgment.  Doc. No. 22.

3.    Plaintiff DirecTV's Memorandum in Opposition to Defendant Dale

Miller's Motion for Summary Judgment.  Doc. No. 27.

### Background

Plaintiff DirecTV ("DirecTV") broadcasts a variety of television programming

from its network of satellites.  DirecTV bundles its channels into programming packages

and pay-per-view events so its customers can tailor their subscriptions to suit their own

tastes. Doc. No. 27, p. 2.  To ensure that only subscribers are able to watch its

programming, DirecTV encrypts its satellite transmissions and requires its customers to

use specialized equipment, including something called an access card, to decode the

signals.  Id.  DirecTV continually upgrades its security protocols to exclude unauthorized

viewers, known as pirates.  One strategy is to transmit a special signal, called an

electronic countermeasure, throughout the system which disables unauthorized access

79

cards by instructing them to perform a meaningless operation over and over again in an infinite loop. *Id.* at pp. 3-4.

Pirates, however, work just as assiduously to defeat DirecTV's encryption and electronic countermeasures. Various companies, including Vector Technologies, devised a way to "unloop" disabled access cards and thereby render them useful again for unlawfully decoding DirecTV. *Id.* at p. 4. It is undisputed in the record that Defendant bought two "Vector Super Unloopers" in March 2001 from Vector Technologies. It is further undisputed that these devices have no legitimate use and the purpose for which they were expressly designed is the theft of DirecTV viewing. *Id.* at p. 3.

Defendant does not deny that he purchased the unloopers. He simply avers that he has never illegally intercepted DirecTV. Doc. No. 24, Miller Aff. ¶ 3. He also states that he is a DirecTV subscriber. In support of this latter contention, he attaches to his memorandum a bill from DirecTV indicating that he was a subscriber in at least July and August, 2003.[1] Doc. No. 22, Ex. C.

### Standard of Review

Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the

---

[1] This bill is labeled Exhibit "C." Exhibits "A" and "B," however, do not appear to exist.

nonmoving party." *Id.* The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether the moving party has satisfied the burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (citation omitted). If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then a court must not grant summary judgment. *Id.* (citation omitted).

## Analysis

### 1.    Overview

Defendant's motion for summary judgment is premised on his belief that DirecTV "must provide testimony, a witness, or some scintilla of evidence of **actual illegal interception of the satellite signal**." Doc. No. 22, p. 1 (emphasis in original). He contends that DirecTV has "**no credible evidence**" to substantiate its allegation that he pirated its broadcasts. *Id.* at p. 2 (emphasis in original). What Defendant appears to mean is that DirecTV cannot prevail as a matter of law because it does not have the testimony of an eyewitness who saw Defendant using his unlooper to watch illegally intercepted programming. Defendant also points for good measure to a bill from DirecTV indicating that he paid for a July 2003 subscription and owed for an August 2003 subscription. *Id.*, Ex. C. This is presumably meant to imply that Defendant is a

legitimate customer. As will become evident, however, Defendant's conclusions are grounded in poor reasoning and an erroneous understanding of the law of evidence.

DirecTV, on the other hand, argues that 18 U.S.C. section 2520 imposes civil liability for violations of the criminal provision 18 U.S.C. section 2512, which makes it a crime, *inter alia*, to possess any device whose primary purpose is the unauthorized interception of wire, oral, or electronic communications. Doc. No. 27, pp. 1, 5-8. In support of its argument, DirecTV cites the legislative history of section 2512 as well as *U.S. v. Herring*, 993 F.2d 784 (11th Cir. 1993). *Id.* at pp. 5-8. As will become evident, however, these citations are not only inapposite but irrelevant as well because the Court has already ruled that DirecTV may not recover civilly for a violation of section 2512.

The Court will address the arguments of each party in turn, beginning with DirecTV.

## 2.    Is DirecTV's evidence of a section 2512 violation sufficient to resist summary judgment?

DirecTV's memorandum in opposition to summary judgment focuses exclusively on count three of the complaint, a violation of 18 U.S.C. section 2512. *See* Doc. No. 27, pp. 5-8. DirecTV contends that Defendant's purchase of the unloopers is conclusive proof that he violated section 2512, which criminalizes the possession of piracy equipment, and he is, therefore, civilly liable pursuant to section 2520.

While its reasoning is impeccable, DirecTV overlooks one salient fact: DirecTV's cause of action under section 2512 was dismissed in September, 2003. *See* Doc. No. 17. The only pending claims against Defendant are counts one and two, which DirecTV

neglects to address in any way in its memorandum. Strictly speaking, DirecTV's failure to contest Defendant's motion for summary judgment on counts one and two creates a strong presumption that the requested relief is unopposed. *See* Doc. No. 20, p. 5. (Case Management and Scheduling Order stating "Where no memorandum in opposition has been filed, the Court routinely grants the motion as unopposed."). DirecTV, in other words, has exposed itself to an adverse summary judgment ruling because it has not addressed the issues on point in response to Defendant's motion for summary judgment.

### 3.    Could a reasonable jury find for DirecTV?

As mentioned earlier, Defendant contends that he cannot be held liable under counts one and two, which claim that he stole DirecTV's programming in violation of 47 U.S.C. section 605(a) (count one) and 18 U.S.C. section 2511 (count two), because DirecTV has no eyewitness evidence that he ever used his unloopers to intercept satellite transmissions illegally. He cites *DirecTV v. Jacas*, 6:03-cv-800-ORL-31-JGG, which held that a default judgment for illegal interception was improper where DirecTV's evidence consisted of nothing but an inference of interception based on the mere possession of satellite piracy equipment. *See* Doc. No. 22, p. 2. Defendant makes two additional assertions. First, he claims that he is an active DirecTV subscriber, implying, the Court supposes, that he is a legitimate customer, not a signal pirate. *Id.* Second, he contends his "litigation is part of a cynical corporate strategy that is abusing the Federal Court System on a nationwide basis." *Id.*

To begin with, Defendant must understand that there are two types of evidence: direct and circumstantial. Direct evidence consists of evidence which "if believed

immediately establishes the factual matter to be proved by it without the need for inferences." *Merriam-Webster's Dictionary of Law* (1996). Examples of direct evidence include eyewitness testimony or a videotape of some wrongdoing. Circumstantial evidence, on the other hand, tries to prove a primary fact by proving related facts, which if believed support an inference that the primary fact is true. *Id.* Examples of circumstantial evidence include fingerprints or DNA, which, if found at a crime scene, support the inference that the person to whom the fingerprints or DNA belong was at the crime scene. Direct evidence is neither inherently superior to nor inferior to circumstantial evidence. The reliability and persuasiveness of all evidence, whether direct or circumstantial, must be evaluated on a case-by-case basis.

When Defendant states that DirecTV has no evidence that he has illegally intercepted satellite transmissions, what he means to say is that DirecTV has no direct evidence. DirecTV, in other words, does not have eyewitness testimony or videotape evidence of Defendant sitting in his living room watching DirecTV for free. DirecTV does, however, have circumstantial evidence that Defendant pirated its broadcasts: Defendant purchased illegal piracy equipment. His purchases support the inference that he used his illicit equipment to intercept broadcasts illegally. Under Federal Rule of Civil Procedure 56, summary judgment is inappropriate when the Court concludes as a matter of law that a reasonable jury, upon careful consideration of the evidence, could find for the non-movant (which in this case is DirecTV). *See supra*, pp. 2-3, Standard of Review. The relevant question, therefore, is whether a reasonable jury could, on the basis of DirecTV's circumstantial evidence, conclude that Defendant pirated DirecTV's signals.

A reasonable jury could conclude that Defendant illegally stole DirecTV's programming. Based on their life experience, a jury could reasonably assume that people only buy electronic equipment such as televisions, computers, or (in the case of Defendant) satellite piracy unloopers when they plan to use such equipment. It would be a strange world, after all, if people regularly bought such equipment and then put it in the closet to collect dust. With this assumption in mind, a reasonable jury could then reject Defendant's self-serving testimony that he has never pirated satellite signals and conclude instead that he did what normal people do after they buy electronic equipment – they use it.[2]

Defendant's evidence that he is or perhaps was a DirecTV subscriber in good-standing has minuscule probative value. Defendant's bill from DirecTV, which he attached to his memorandum as an exhibit, indicates only that he paid for one month of DirecTV in the summer of 2003 and was being billed for a subsequent month. Defendant apparently hopes to use this circumstantial evidence to support the inference that he has never stolen DirecTV programming because he has paid for at least one month of it. It is self-evident, however, that a single payment to DirecTV a few months ago does not prove in any way that Defendant never used his unloopers, purchased in March 2001, to steal DirecTV broadcasts.[3]

---

[2] To the extent that the *Jacas* opinion concludes that DirecTV's circumstantial evidence is inadequate as a matter of law to support an inference of signal piracy, this Court respectfully disagrees.

[3] Other than to note that casting gratuitous aspersions on the integrity of DirecTV is improper, the Court will ignore Defendant's unsupported conclusion that DirecTV's lawsuit against him is cynical and abusive.

### 4.    Is summary judgment appropriate?

Summary judgment is inappropriate.  While DirecTV failed to oppose Defendant's motion for summary judgment on the only pending claims and Defendant based his motion on a misunderstanding of the law, the uncontroverted evidence before the Court nonetheless establishes the existence of a disputed question of material fact.  In this case, the Court must look past the substandard memoranda and into the record because it is anathema to justice to resolve a genuine controversy simply by weighing the errors of one party against the errors of another.  Despite the efforts of Plaintiff and Defendant to obfuscate the issue, liability under counts one and two of the complaint depends on the resolution by a jury of a material question of fact: does Defendant's purchase of two unloopers support the inference that he used those pirate access devices to steal DirecTV programming?  The Court, therefore, denies Defendant's motion for summary judgment and instructs the parties, especially counsel for DirecTV, to adhere in the future to a higher standard of professionalism.[4]

---

[4] While it is true that *pro se* parties like Defendant are entitled to lenience from the Court, this is not a license to ignore the duty to research both the facts and the law.  Defendant is reminded that his decision to proceed *pro se* does not mean that the Court steps in on his behalf as legal counsel.

CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Doc. No. 21) is **DENIED**.

**DONE** and **ORDERED** in Chambers in Orlando, Florida this 20th day of November, 2003.

PATRICIA C. FAWSETT
CHIEF UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

F I L E   C O P Y

ate Printed: 11/20/2003


otice sent to:

     ____   Dale Miller
           1421 Falconwood Court
           Apopka, FL   32712

           6:03-cv-01027    rdo

     ____   Michael T. Sheridan, Esq.
           Stump, Storey, Callahan & Dietrich, P.A.
           37 N. Orange Ave., Suite 200
           P.O. Box 3388
           Orlando, FL   32802-3388

           6:03-cv-01027    rdo

     ____   Richard Trapp
           Law Office of Richard Trapp
           2518 Edgewater Dr., Suite 4
           Orlando, FL   32804

           6:03-cv-01027    rdo

# UNITED STATES DISTRICT COURT

### MIDDLE DISTRICT OF FLORIDA

**SHERYL L. LOESCH**
CLERK OF COURT
80 NORTH HUGHEY AVENUE
ORLANDO, FLORIDA 32801-2278

www.flmd.uscourts.gov

11/20/03

**To:**  Michael T. Sheridan
Stump, Storey, Callahan & Dietrich, P.A.
37 N. Orange Ave., Suite 200 P.O. Box 3388
Orlando, FL  32802

**Re:**  Official Facsimile Transmittal of Court Document

---

Enclosed Court document entered in:

case number:           6:03-cv-01027

instrument number:     29

If after three attempts this fax fails, then we will print this document and mail it to you.  For questions, please call:   407-835-4200

Number of pages including cover sheet:  11

This facsimile may contain PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this facsimile, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited. If you have received this facsimile in error, please notify the United States District Court at:   407-835-4200  Thank you for your cooperation.

*1997 U.S. Dist. LEXIS 13505, **

Time Warner Cable of New York City, Plaintiff, - against - Linda Domsky, et al., Defendants.

96 Civ. 6851 (DAB) (RLE)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1997 U.S. Dist. LEXIS 13505

September 2, 1997, Decided

**DISPOSITION:  [*1]**  Recommended that this judgment entered for plaintiff in the amount of $ 8,590.24 against Mendez and $ 6,840.24 against Malik.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff cable television company sought damages from defendants individuals under the Communications Act of 1934, as amended, 47 U.S.C.S. §§ 553(a) and 605(a), for intercepting the cable company's signals.

**OVERVIEW:** Defendants were individuals who used pirate boxes to intercept the cable company's scrambled signals. The cable company sued the individuals and won default judgments. The cable company then sought damages under the § 605(a). The court entered judgment for the cable company awarding damages for willful violation of § 605(a) of $ 8,590.24 against one individual and $ 6,840.24 against the other plus attorney's fees. The court found that each individual's use of a pirate box was a single statutory violation. Although these amounts reasonably approximated the cable company's lost revenue from the use of the pirate box, they were not sufficient deterrence to limit the damages to the value of the stolen services. Therefore, the court set the damage award at roughly twice the amount of fees avoided, or $ 250 for each month the pirate box was used.

**OUTCOME:** The court entered judgment entered for the cable television company in the amount of $ 8,590.24 against one individual and $ 6,840.24 against the other individual.

**CORE TERMS:** programming, subscriber, pay-per-view, premium, pirate, channel, converter-decoder, cable television, scrambled, unauthorized, reception, signal, cable, box, subscription, descramble, movies, cable television system, broadcast, television, decoder, tier, recommend, willful, viewing, cable operator, scrambling, addressability, descrambling, intercept

### LexisNexis(R) Headnotes  ◆ Hide Headnotes

Civil Procedure > Early Pretrial Judgments > Default > Entry of Default & Default Judgment

*HN1* A default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability. More Like This Headnote

Communications Law > Federal Acts > Communications Act 

*HN2* 47 U.S.C.S. § 553(a) provides, in pertinent part: No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law. More Like This Headnote

Communications Law > Federal Acts > Communications Act 

*HN3* 47 U.S.C.S. § 553(b) prescribes criminal penalties for willful violations, and 47 U.S.C.S. § 553(c) creates a civil cause of action for any person aggrieved by any violation of 47 U.S.C.S. § 553(a)(1). Civil remedies include injunctive relief, damages, costs and attorney's fees. 47 U.S.C.S. § 553(c)(2). As to damages, the party aggrieved may prove actual damages as specified in 47 U.S.C.S. § 553(c)(3)(A)(i), or may elect to receive, under 47 U.S.C.S. § 553(c)(3)(A)(ii), statutory damages for all violations involved in the action, in a sum of not less than $ 250 or more than $ 10,000 as the court considers just. Whichever method of computation of damages is chosen, the amount awarded may be increased if plaintiff proves willfulness or decreased if defendant proves innocence. 47 U.S.C.S. §§ 553(c)(3)(B) and (C). More Like This Headnote

Communications Law > Related Legal Issues > Theft of Service 

*HN4* 47 U.S.C.S. § 605(a) provides, in pertinent part: No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. More Like This Headnote

Communications Law > Federal Acts > Communications Act 

*HN5* 47 U.S.C.S. § 605(e)(1) and (2) prescribe criminal penalties, and 47 U.S.C.S. § 605(e)(3) creates a civil right of action for persons aggrieved. Civil remedies include injunctive relief, costs and attorney's fees, 47 U.S.C.S. § 605(e)(3)(B)(i) and (iii); and either actual damages, 47 U.S.C.S. § 605(e)(3)(C)(i)(I), or an award of statutory damages for each violation in a sum of not less than $ 1,000 or more than $ 10,000, 47 U.S.C.S. § 605(e)(3)(C)(i)(II). In provisions that correspond to 47 U.S.C.S. § 553(c)(3)(B) and (C), the amount awarded under 47 U.S.C.S. § 605 may be increased if plaintiff proves willfulness or decreased if defendant proves innocence. 47 U.S.C.S. §§ 605(e)(3)(C)(ii) and (iii). More Like This Headnote

Communications Law > Federal Acts > Communications Act 

*HN6* Where programming is broadcast via orbiting satellites, it is therefore protected under 47 U.S.C.S. § 605(a) as radio communications, and unauthorized reception is a violation of § 605(a), which prohibits the unauthorized reception of protected radio communications, as well as 47 U.S.C.S. § 553 (a)(1), which protects all communication by cable systems. A cable operator can be a person aggrieved within the meaning of 47 U.S.C.S. §§ 553(c)(1) and 605(e)(3)(A). More Like This Headnote

<u>Communications Law</u> > <u>Federal Acts</u> > <u>Communications Act</u> 

<sup>HN7</sup> When a court determines that a defendant's conduct has violated the Communication Act of 1934, <u>47 U.S.C.S. §§ 605</u> and 553, a plaintiff may recover damages only under one of those sections. An aggrieved cable operator is entitled to elect to recover damages under <u>47 U.S.C.S. § 605</u> in consideration of § 605's higher damages awards. <u>More Like This Headnote</u>

**COUNSEL:** For TIME WARNER CABLE OF NEW YORK CITY, plaintiff: Daniel John Lefkowitz, Law Offices of Daniel J. Lefkowitz, Jericho, NY.

For ROBERT METZLER, defendant: Maureen Michele Finn, RESID., NY, NY.

For LUIS MONTALVO, defendant: Mary E. Sheridan, Matthew F. Cooper, Esq., New York, NY.

DANI ORTOLANO, counter-claimant, Pro se, New York, NY.

For TIME WARNER CABLE OF NEW YORK CITY, counter-defendant: Daniel John Lefkowitz, Law Offices of Daniel J. Lefkowitz, Jericho, NY.

**JUDGES:** Honorable Ronald L. Ellis, United States Magistrate Judge. HONORABLE DEBORAH A. BATTS, U.S.D.J.

**OPINIONBY:** Ronald L. Ellis

**OPINION: REPORT AND RECOMMENDATION**

**To the HONORABLE DEBORAH A. BATTS, U.S.D.J.:**

**I. INTRODUCTION**

This is an action by a cable television system operator against twenty-one individuals for unauthorized interception and viewing of plaintiff's "scrambled" cable-borne television signals by means of an illegal decoder device. On February 10, 1997, default judgments were entered against Sigfredo Mendez and Jackie Malik, the two defendants who are the subject **[*2]** of this Report and Recommendation. The matter was referred to the undersigned for an inquest on damages. Plaintiff seeks damages pursuant to the Communications Act of 1934, as amended, <u>47 U.S.C. §§ 553</u>(a) and 605(a). For the reasons stated below, I recommend that judgment be entered for plaintiff in the amount of $ 8,590.24 against Mendez and $ 6,840.24 against Malik.

**II. BACKGROUND**

Time Warner Cable of New York City ("TWCNYC") is a cable television operator which has been awarded franchises by New York City. Affidavit of Thomas Allen, dated March 9, 1997, submitted in support of inquest for damages ("Allen Aff."), at P 2. Pursuant to these franchises, TWCNYC is authorized to construct, operate and maintain cable television programming in New York, Kings, and Queens Counties. **Id**. TWCNYC programming consists of various tiers of cable television programming and

different individual programming channels. **Id**. at P 3. The "Broadcast Basic" and "Standard" service tiers, for example, are levels of cable television programming service which an individual can subscribe to at a monthly rate which allows a subscriber to receive a package of different programming channels, **[*3]** such as CNN, A&E and MTV, but does not include any "premium" or pay-per-view programming. **Id**. at P 3.

TWCNYC subscribers may elect to subscribe to one or more "premium" programming services such as Cinemax, Home Box Office and Showtime, for an additional monthly charge per service. **Id**. at P 4. TWCNYC also offers pay-per-view programming, which is a service enabling a subscriber to purchase individual movies, sporting events, or other entertainment for a per-event fee over and above the subscriber's regular monthly fee. **Id**. at P 5. Each subscriber is entitled to receive only the level of programming and services which he or she selects and pays for. **Id**. at P 6.

TWCNYC receives the signals to all of its premium and most of its pay-per-view programming channels by transmissions received via orbiting satellites from the producers of such programming. **Id**. at P 7. TWCNYC's premium and pay-per-view programming is protected from unauthorized reception during its transmission to TWCNYC's satellite reception facilities, known as the cable "head-end." **Id**. The signals for all of TWCNYC's cable television services are transmitted from **[*4]** TWCNYC reception facilities to subscribers' residences through a network of cable wiring and equipment (the "System"). TWCNYC retransmits or "cablecasts" the signals to its premium and pay-per-view programming, along with all other programming offered by TWCNYC, in a simultaneous data stream to subscribers over its cable television system. **Id**.

For a subscriber to receive these transmitted cable television signals on his or her television set, TWCNYC provides each subscriber with a device known as a "converter," which converts the multiple signals simultaneously transmitted over the System into different "channels," which can be viewed on a subscriber's television set. **Id**. at P 8. To prevent subscribers from receiving programming services for which they have not paid, TWCNYC encodes or "scrambles" the signals to all of its premium and pay-per-view programming services. **Id**. at P 9. "Scrambling" is a principal security measure used by TWCNYC and other cable operators to protect their programming services against unauthorized reception of service. **Id**. Subscribers purchasing scrambled channel options are provided with a device known as a "descrambler" **[*5]** or "decoder," which is incorporated into a converter. **Id**. The decoder descrambles the encrypted programming which is purchased by a subscriber so that the purchased programming can be viewed clearly on a subscriber's television set. **Id**. Programming not purchased will continue to be scrambled and, therefore, will be unviewable on the subscriber's television set. **Id**.

TWCNYC separately authorizes, either by a technical modification or by a computer command, each of the converter-decoders provided to its subscribers to descramble only those scrambled programming channels which the respective subscriber has selected and purchased. **Id**. at P 10. The converter-decoders which TWCNYC provides to its subscribers have the technology feature and function known as "addressability." **Id**. Addressability is a communication link between a cable operator's central computer and the descrambling and computer circuitry in each converter-decoder provided to its subscribers. **Id**. Addressability enables a cable operator to send a signal command to the converter-decoders assigned to those subscribers who have purchased a pay-per-view program. **[*6] Id**. The signal

command instructs the converter-decoder assigned to those subscribers to descramble the particular pay-per-view program which has been purchased. **Id**. When the pay-per-view program is over, another command is sent for those converter-decoders to resume scrambling pay-per-view programming. **Id**. This procedure limits a subscriber's authorized reception of pay-per-view programming to only those programs which have been purchased. **Id**. Addressability also enables a cable operator to upgrade or downgrade their subscribers' authorized levels of service without having to mechanically alter or physically replace a converter-decoder by way of a service call to a subscriber's residence. **Id**.

TWCNYC's contract agreements with its subscribers forbid unauthorized tampering with TWCNYC's equipment and the unauthorized reception of programming services. **Id**. at P 12. It is possible, however, for an individual to install a modified or "pirate" converter-decoder onto TWCNYC's cable system in place of TWCNYC's authorized converter-decoder. **Id**. "Pirate" devices enable reception of all of TWCNYC's scrambled programming, including **[\*7]** all premium and pay-per-view channels, without the subscriber paying for such programming. **Id**. In most cases, TWCNYC cannot detect or prevent the theft of its programming services from "pirate" converter-decoders without affirmative permission from a subscriber to conduct an on-site inspection. **Id**.

TWCNYC's claims against defendants Malik and Mendez arose after TWCNYC recovered the records of the business known as Freedom Electronics of Fort Lauderdale, Florida ("Freedom"). **Id**. at P 13. TWCNYC instituted litigation against Freedom for its sale and distribution of "pirate" converter-decoders which Freedom knew and intended would be used to intercept and descramble TWCNYC's scrambled premium, pay-per-view and other programming service without TWCNYC's authorization. **Id**. Freedom's business records included sales invoices of "pirate" converter-decoders which Freedom sold and shipped to TWCNYC subscribers. **Id**. TWCNYC's complaint against the two defendants in default, Jackie Malik and Sigfredo Mendez, alleges that these individuals intercepted and received TWCNYC's premium and pay-per-view programming without TWCNYC's authorization by the **[\*8]** use of "pirate" converter-decoders purchased from Freedom. **Id.**

## A. Sigfredo Mendez

The sales records of Freedom indicate that on February 9, 1994, Mendez purchased a "Base Band Epoxy Cube," which was shipped to his residence in New York County. **Id**. at P 14. A Base Band Epoxy Cube is a "pirate" cable descrambling device which is manufactured only by "pirate" vendors such as Freedom and is not used by any franchised cable television operator. **Id**. The sole function of this device is to enable its user to descramble cable television broadcasts, and it has no legitimate (non-theft related) purpose on a cable television system. **Id**. This device is specifically designed to defeat the type of scrambling technology used by TWCNYC on its cable television system in lower Manhattan, where Mendez resides, thereby enabling Mendez to have unauthorized access to all of TWCNYC's scrambled premium and pay-per-view programming. **Id**.

From April 16, 1987, to the present, Mendez has been a residential subscriber to TWCNYC's cable television service at his residence. On February 9, 1994, the date he purchased the "pirate" box, Mendez subscribed to TWCNYC's **[\*9]** "Standard" service tier and had purchased a subscription to two premium channels, Cinemax and Showtime. **Id**. On February 28, 1994, Mendez downgraded and canceled his

subscription to Cinemax and Showtime to just Standard service. **Id**. Later, on April 13, 1995, Mendez canceled his subscription to Standard service and ordered TWCNYC's "Broadcast Basic" service tier. **Id**. Mendez has not purchased any pay-per-view programming since February 9, 1994. **Id.**

## B. Jackie Malik

The sales records of Freedom indicate that on September 9, 1994, Malik purchased a "97.5 Cube," which was shipped to her residence in New York County. **Id**. at P 16. This device is another type of "pirate" cable descrambling device which is manufactured only by "pirate" vendors and is not used by any franchised cable television operator. **Id**. The sole function of this device is to enable its user to descramble cable television programming services such as premium and pay-per-view channels, and it has no legitimate (non-theft related) purpose on a cable television system. **Id**. This device is specifically designed to defeat the type of scrambling technology used **[*10]** by TWCNYC on its cable television system in lower Manhattan, where Malik resides, thereby enabling Malik to have unauthorized access to all of TWCNYC's scrambled premium and pay-per-view programming. **Id**.

From August 30, 1994 to the present, Malik has been a residential subscriber to TWCNYC's cable television service at her residence. **Id**. at P 17. On September 9, 1994, the date of Malik's purchase of a descrambling cube, Malik subscribed to TWCNYC's "Standard" service tier. **Id**. Between September 9, 1994 and the institution of this action, Malik did not purchase any premium or pay-per-view channels and her subscription to Standard service was constant and unchanged. **Id**.

By use of the "pirate" devices purchased from Freedom, defendants Mendez and Malik had access to all of TWCNYC's scrambled premium channels and had constant, round-the-clock reception to pay-per-view programming services without having to pay for such programming. **Id**. at P 18.

TWCNYC's Standard service carries a subscription rate of approximately $ 30 per month. **Id**. at 8 n.2. A subscription to all of TWCNYC's premium channels costs approximately $ 70 per month. **[*11] Id**. Pay-per-view movies cost approximately $ 4 per event, while some pay-per-view special events, such as championship boxing matches, can cost as much as $ 40. **Id**. Although it is not possible to know exactly how many programs were intercepted by defendants, they could have viewed hundreds of dollars worth of programming each month.

## III. DISCUSSION

The defendants have failed to appear or defend in this action and have been adjudged in default by the order entered by Judge Batts. <sup>HN1</sup>"[A] default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability." **Bambu Sales, Inc. v. Ozak Trading, Inc.**, 58 F.3d 849, 854 (2d Cir. 1995) (quoting **Trans World Airlines, Inc. v. Hughes**, 449 F.2d 51, 63 (2d Cir. 1971), **rev'd on other grounds**, 409 U.S. 363, 34 L. Ed. 2d 577, 93 S. Ct. 647(1973).

Plaintiff was directed by the undersigned to submit affidavits and any other documentation in support of its request for damages. Plaintiff argues that each month of unauthorized service is a separate statutory violation and seeks maximum statutory damages of $ 10,000 under 47 U.S.C. § 605 for each of the claimed **[*12]** violations.

## A. Statutory Framework

*HN2* Section 553(a) of title 47 of the United States Code provides, in pertinent part: No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

*HN3* Subsection (b) prescribes criminal penalties for willful violations, and subsection (c) creates a civil cause of action for "any person aggrieved by any violation of subsection (a)(1)." Civil remedies include injunctive relief, damages, costs and attorney's fees. 47 U.S.C. § 553(c)(2). As to damages, the party aggrieved may prove "actual damages" as specified in subsection (c)(3)(A)(i), or, as plaintiff has done here, may elect to receive, under subsection (c)(3)(A)(ii), "statutory damages for all violations involved in the action, in a sum of not less than $ 250 or more than $ 10,000 as the court considers just." Whichever method of computation of damages is chosen, the amount awarded may be increased if plaintiff proves willfulness or decreased if defendant proves innocence. 47 U.S.C. §§ 553(c)(3)(B) **[*13]** and (C).

*HN4* Section 605(a) of title 47 of the United States Code provides, in pertinent part: No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.

47 U.S.C. § 605(a). *HN5* Subsections (e)(1) and (2) prescribe criminal penalties, and subsection (e)(3) creates a civil right of action for "person[s] aggrieved." 47 U.S.C. § 605(e)(3)(A). Civil remedies include injunctive relief, costs and attorney's fees, § 605(e)(3)(B)(i) and (iii); and either "actual damages," § 605(e)(3)(C)(i)(I), or "an award of statutory damages for each violation . . . in a sum of not less than $ 1,000 or more than $ 10,000 . . . ," § 605(e)(3)(C)(i)(II). In provisions that correspond to § 553(c)(3)(B) and (C), the amount awarded under § 605 may be increased if plaintiff proves willfulness or decreased if defendant proves innocence. §§ 605(e)(3)(C)(ii) and (iii).

## B. Defendants' Liability

TWCNYC's *HN6* programming is broadcast via orbiting satellites and is therefore protected under 47 U.S.C. § 605(a) as radio communications, **[*14]** and defendants' unauthorized reception is a violation of 47 U.S.C. § 605(a), which prohibits the unauthorized reception of protected radio communications, as well as § 553 (a)(1), which protects all communication by cable systems. **International Cablevision, Inc. v. Sykes, 75 F.3d 123, 133 (2d Cir. 1996)** ("Sykes II"); **Time Warner Cable of New York City v. U.S. Cable T.V., Inc., 920 F. Supp. 321, 328-29 (E.D.N.Y. 1996).** TWCNYC is a "person aggrieved" within the meaning of 47 U.S.C. §§ 553(c)(1) and 605(e)(3)(A).

*HN7* When a court determines that a defendant's conduct has violated both § 605 and § 553 of the Communications Act, a plaintiff may recover damages only under one of those sections. **American Cablevision of Queens v. McGinn, 817 F. Supp. 317, 320 (E.D.N.Y. 1993).** An aggrieved cable operator is entitled to elect to recover

damages under § 605 in consideration of § 605's higher damages awards. **International Cablevision, Inc. v. Sykes**, 997 F.2d 998, 1007 (2d Cir. 1993); **Sykes II**, 75 F.3d at 127.

TWCNYC has elected to recover money damages against each defendant in the form of statutory damages as opposed to actual damages, and **[*15]** seeks enhancement for willful violations. Because this case resulted in a default judgment, there is no evidence to contest the finding of willful violation. Defendants, however, could not have believed that they were legitimately entitled to descramble the broadcasts using the pirate boxes. These were willful violations. Plaintiff is entitled to some enhancement of the damages award. Although there is no proof that defendants profited from the use of the illegal boxes, such use did deprive plaintiff of significant income. The enhancement of damages for willfulness should, therefore, take into account the duration of the violation.

## C. Calculation of Damages

TWCNYC argues that each month in which the pirate device was used by one of the defendants constitutes a separate violation because each month represents a separate billing cycle in which the defendants failed to purchase programming. In addition, TWCNYC asserts that the violations were willful and justify awarding damages at the highest level. TWCNYC thus seeks the maximum statutory damages of $ 10,000 for each month for which the device was connected. Defendant Mendez used his device for a period of thirty-one (31) **[*16]** months and defendant Malik for a period of twenty-four (24) months. This results in damage requests of $ 310,000 and $ 240,000 against Mendez and Malik, respectively.

The court disagrees with plaintiff that each month should be considered a separate statutory violation. In this case, the violation is the use of a pirate box to intercept TWCNYC's scrambled cable broadcasts. While the interpretation suggested by TWCNYC would maximize the damages and, therefore, the deterrence effect, the statutory language more strongly supports the conclusion that there was one violation in this case, although of varying duration for each defendant. Indeed, if the court were to follow the plaintiff's reasoning, there would be a violation for each pay-per-view telecast. Each pay-per-view program requires a separate authorization from plaintiff and would therefore be considered a separate violation under plaintiff's analysis. I find that each defendant's use of a pirate decoder constitutes a single statutory violation.

According to plaintiff, its Basic service costs approximately $ 30 per month while subscription to all premium channels costs approximately $ 70 per month. The plaintiff thus potentially **[*17]** loses $ 40 per month when a pirate box allows a user to receive scrambled channels. In addition, the plaintiff provides multiple pay-per-view events, movies, and special events each month. Pay-per-view movies cost approximately $ 4 per viewing, and special events, such as boxing matches, may cost as much as $ 40 per broadcast. While it is not possible to know how many movies the defendants would have viewed illegally, more than a dozen movies are available each month. The viewing of ten to twelve movies at $ 4 per movie and one premium event at $ 40 would result in an additional loss to plaintiff of approximately $ 80 to $ 88 per month. [n1] Adding this amount to the $ 40 lost on premium programming, the total loss to plaintiff would be approximately $ 120 to $ 128 per month.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 These decoders were used in private residences. While in theory defendants could have viewed every pay-per view offering each time it was broadcast, I have attempted to make a reasonable assessment of actual use by a private violator as opposed to a commercial violator. Time and taste would limit the actual viewing by defendants.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*18]**

While I find that these amounts reasonably approximate the lost revenue from the use of a pirate box, it would not be sufficient deterrence if the damages payable by a violator were limited to the value of the stolen services. There would be no incentive to cease the violation if the penalty were merely the amount that should have been paid. The statute recognizes this fact in setting a minimum damage award of $ 1,000. I find that the damage award should be roughly equivalent to twice the amount of fees avoided, or approximately $ 250 per month.

Defendant Mendez began using his pirate box on or about February 1994 and defendant Malik began using his box in September 1994. The complaint was filed in September 1996. Mendez thus deprived TWCNYC of thirty-one (31) months of payments and Mendez, twenty-four (24) months. At $ 250 per month, Mendez shall be liable for damages of $ 7,750 and Malik for damages of $ 6,000.

## C. Attorney's Fees

Plaintiff has submitted an affidavit by William B. Jung indicating the tasks performed, the hours spent, and the rate requested. I have examined the supporting documentation and conclude that plaintiff's attorney's fees and disbursements were reasonable **[*19]** and adequately documented. Plaintiff seeks a total award of $ 1,680.48, divided equally between the two defendants. I therefore recommend that TWCNYC be awarded $ 840.24 against each defendant.

## III. CONCLUSION

For willful violation of § 605(a), I recommend that defendant Mendez pay statutory damages of $ 7,750, plus costs and attorney's fees of $ 840.24, for a total of $ 8,590.24. For willful violation of § 605(a), I recommend that defendant Malik pay statutory damages of $ 6,000, plus costs and attorney's fees of $ 840.24, for a total of $ 6,840.24. Judgment should be entered accordingly.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Deborah A. Batts, 500 Pearl Street, Room 2510, and to the chambers of the undersigned, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal **[*20]** to the United States Court of Appeals. *See* **Thomas v. Arn**, 474 U.S. 140, 150, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985); **Small v. Secretary of Health and Human Services**, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. §

636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(e).

**DATED: September 2, 1997**
**New York, New York**

**Respectfully Submitted,**

**The Honorable Ronald L. Ellis**

**United States Magistrate Judge**

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
DIRECTV, INC., Plaintiff,
v.
Brendan GETCHEL, Defendant.
No. 3:03 CV 2073(GLG).
May 26, 2004.
Wayne D. Lonstein, Lonstein Law Office, Ellenville, NY, for Plaintiff.

*MEMORANDUM DECISION*

GOETTEL, J.
 *1 On March 25, 2004, this Court granted Plaintiff's Motion for Default Judgment against Defendant, Brendan Getchel, who was alleged to have utilized a "pirate" cable television decoding device at his home to intercept DIRECTV's programming services without authority and without payment to DIRECTV. DIRECTV alleged that Getchel purchased this device and related equipment on April 6, 2001, from a Canadian company by using interstate or foreign wire facilities. It further alleged that Getchel's conduct has deprived it of subscription and pay-for-view revenues, has compromised its security and accounting systems, and infringed its trade secrets and proprietary information, and has interfered with its contractual and prospective business relations.

DIRECTV sets forth three substantive claims in its complaint: (1) Getchel's unauthorized reception of satellite signals in violation of the Federal Communications Act of 1934, as amended, 47 U.S.C. § 605(a); (2) his unauthorized interception of electronic communications in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1)(a) and/or § 2511(1)(b); and (3) his possession of a pirate access device in violation of 18 U.S.C. § 2512(1)(b). The Motion for Default Judgment, however, seeks damages only on the Communications Act claim. [FN1] (Pl.'s Mot. and Affirmation in Support of Default at ¶ 11; Pl.'s Mem. in Support of Default Judgment at 5; Pl.'s Mem. of Law in Support of Request for Damages at 5. [FN2])

FN1. We note that in two cases factually similar to the instant case, the courts declined to award damages under 18 U.S.C. § 2520(c)(2) (providing for actual damages or statutory damages of $100 a day for each day of violation or $10,000, whichever is greater) where there was
no evidence as to how many days the defendant used the pirate access device or that the defendant had profited significantly from his violations or induced others to engage in similar conduct. *See DIRECTV, Inc. v. Kaas,* 294 F.Supp.2d 1044, 1048-49 (N.D.Iowa 2003); *DIRECTV, Inc. v. Perrier,* No. 03-CV-400S, 2004 WL 941641, at *4 (S.D.N.Y. Mar. 15, 2004); *but see DIRECTV, Inc. v. Braun,* No. 3:03CV937, 2004 WL 288805, at *1 (D.Conn. Feb.9, 2004) (awarding $10,000 in damages under § 2520(c)(2)(B), although, in that case, there were no damages claimed under 47 U.S.C. § 605(e)(3)(C)(i), as in the instant case). In *Kaas* and *Perrier,* however, the courts awarded damages under 47 U.S.C. § 605(e)(3)(C)(i). In the instant case, there is no evidence concerning Getchel's actual use of the pirated device or that he profited from it, except avoiding subscription charges with DIRECTV. Therefore, we only award damages under 47 U.S.C. § 605(e)(3)(C)(i).

FN2. At the request of the Court, DIRECTV submitted a memorandum on damages, which was served on Getchel. No response has been filed by Getchel.

*Discussion*

Because a default has been entered, the allegations of the complaint that establish Getchel's liability are accepted as true. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir.1992), *cert. denied,* 506 U.S. 1080, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993); Fed.R.Civ.P. 8(d). Damages, however, must be established by proof, unless the damages are liquidated or "susceptible of mathematical computation," *Flaks v. Koegel,* 504 F.2d 702, 707 (2d Cir.1974), which these are not. A hearing on damages is not required as long as the Court ensures that there is a basis for the damages awarded. *See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 111 (2d Cir.1997); *see generally Cablevision of Southern Conn., Ltd. P'ship v. Smith,* 141 F.Supp.2d 277, 281- 82 (D.Conn.2001).

Based on the allegations of the complaint, which are deemed admitted, the Court finds that Getchel has violated the Communications Act, 47 U.S.C. § 605(a), [FN3] by virtue of his receipt of DIRECTV's satellite transmissions of television programming without authorization. *See International Cablevision, Inc. v. Sykes,* 75 F.3d 123, 133 (2d Cir.), *cert. denied,* 519 U.S. 929, 117 S.Ct. 298, 136 L.Ed.2d 217 (1996) (holding that an individual's use of a "pirate" cable television descrambling device to intercept without authorization programming services transmitted via satellite constituted a § 605(a)). The Court may reasonably conclude that Getchel purchased the device in order to pirate DIRECTV's transmissions. There is no legitimate purpose for the unlooper device purchased by Getchel. (Aff. of Stanley F. McGinnis at ¶ 17.) *See also Time Warner Cable of New York City v. Barbosa,* No. 98 CIV. 3522, 2001 WL 180366, at *3 (S.D.N.Y. Jan.2, 2001) (finding that there is "no legitimate function or purpose … for a converter-decoder…. Such a device is only capable of enabling its user to receive unauthorized television programming without having to make payment to a cable operator"). The unlooper device, working in conjunction with the satellite dish, satellite receiver, and other equipment that Getchel had in his possession, made it possible for Getchel to intercept and receive DIRECTV's signals without authorization. *See DIRECTV, Inc. v. Karpinsky,* 274 F.Supp.2d 918 (E.D.Mich.2003). Thus, the Court finds that Getchel has violated § 605(a).

FN3. Subsection (a) of 47 U.S.C. § 605 provides in part that "[n]o person not being entitled thereto shall receive … any interstate or foreign communication by radio and use such communication … for his own benefit…."

*\*2* This leaves the issue of damages. DIRECTV has sought statutory damages pursuant to 47 U.S.C. § 605(e)(3)(C)(i) as well as injunctive relief, prejudgment interest, and litigation costs. Under 47 U.S.C. § 605(e)(3)(C)(i), damages are to be computed, "at the election of the aggrieved party," in accordance with any of the following:

(I) actual damages suffered by the aggrieved party as a result of the violation and any profits of the violator; or

(II) statutory damages for each violation of subsection (a) in a sum of not less than $1,000 or more than $10,000, as the court considers just, and, for each violation of paragraph (4) [FN4] of this subsection, statutory damages in a sum of not less than $10,000, or more than $100,000, as the court considers just.

FN4. Paragraph (4) of 47 U.S.C. § 605(e) provides criminal penalties for "[a]ny person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services." It further provides that "the prohibited activity established herein as it applies to each such device shall be deemed a separate violation." *Id.*

DIRECTV has elected to seek statutory damages, as opposed to actual damages, and asks the Court to award $10,000 for Getchel's violation of subsection (a) and $100,000 for Getchel's violation of paragraph (4).

The award of damages under § 605(e)(3)(C)(i) is committed to the Court's sound discretion. *Cablevision of Southern Connecticut,* 141 F.Supp.2d at 286. Courts have used a variety of methods to calculate damages under § 605, including (1) assessing the maximum statutory rate; (2) estimating the amount of services the defendant pirated and applying a multiplier to that figure; (3) adopting the plaintiff's estimate of the amount of services pirated; and (4) where there has been no evidence of the plaintiff's actual usage or commercial advantage, applying the statutory minimum for each pirated device. *See CSC Holdings, Inc. v. Ruccolo,* 01 Civ. 5162, 2001 WL 1658237, at *2 (S.D.N.Y. Dec.21, 2001) (collecting cases); *DIRECTV, Inc. v. Kaas,* 294 F.Supp.2d at 1048 (awarding damages of $1,000 under § 605(e)(3)(C)(i) where the complaint alleged that the defendant had purchased a single pirate access device); *DIRECTV, Inc. v. Hamilton,* 215 F.R.D. 460, 462 (S.D.N.Y.2003) (awarding damages of $2,000 under § 605(e)(3)(C)(i) where one defendant had purchased two pirate access devices and declining to award the maximum statutory damages where the plaintiff had failed to proffer any justification for such an award); *DIRECTV, Inc. v. Perrier,* No. 03-CV-400S, 2004 WL 941641, at *3 (W.D.N.Y. Mar.15, 2004) (awarding $2,000 in damages under § 605(e)(3)(C)(i) where the complaint alleged that the defendant had purchased two pirate access devices). "**In its broad discretion for determining statutory damages, the district court should consider both the willfulness of the defendant's conduct and the deterrent value of the sanction imposed.**" *Cable/Home Communications Corp. v. Network Productions, Inc.,* 902 F.2d 829, 852 (11th Cir.1990).

DIRECTV has alleged and produced evidence that Getchel purchased one pirate access device for use at his home in connection with the satellite equipment he already possessed. There is no claim that he used this commercially or that he purchased the device for resale. Although DIRECTV seeks the maximum statutory penalty of $10,000 per violation, the Court declines to award the maximum amount in light of the fact that there is no evidence concerning Getchel's commercial use of the device or the amount of his actual usage of the device. Following the lead of several courts cited above, the Court awards $1,000 for Getchel's violation of § 605(a) by virtue of his purchase and usage of the device.

*3 Additionally, in light of the fact that Getchel has owned this device since March of 2001 and has been able to avoid paying subscription fees to DIRECTV for a period of 38 months, an award of $1,000 would have no deterrent effect, since this is substantially less than what Getchel would have paid for the satellite programming had he received it in an authorized manner. DIRECTV has produced evidence that during the time Getchel actually subscribed to DIRECTV, the cost of his monthly subscription service was approximately $100, although this does not include pay-per-view programming, which was additional. Thus, the Court in its discretion awards additional damages of $3,800, for a total damage award of $4,800. *See Time Warner Cable of New York v. Barbosa,* 2001 WL 118608, at * 5 (holding that the statutory goals are served by taking into account the duration of the violation and awarding damages based on the plaintiff's lost revenues during this time period times a multiplier).

DIRECTV also seeks an award of damages of $100,000 under 47 U.S.C. § 605(e)(3)(C)(i)(II) for Getchel's violation of subparagraph (4) of that section. *See* Note 4, *supra*. We have two problems with this request. First, DIRECTV did not allege a violation of subparagraph (4) in Count One of its complaint. The only mention of subparagraph (4) is in the prayer for relief. While it could be argued that Getchel's alleged purchasing of the device from a Canadian company constituted "importing" the device under subparagraph (4), it is not clear that Getchel was actually involved in the importing of the device. Plaintiff has produced an invoice for an "MK2 UNLOOPER-SU2," showing the client as Canadian Security and Technology and the contact as Getchel in Waterbury, Connecticut. There is no address for Canadian Security and the attached documentation shows the "Chain/Dealer" as Circuit City Superstore. Thus, it is not clear

whether Getchel purchased this device locally or whether he imported it from Canada. There is no other alleged conduct by Getchel that is encompassed by subparagraph (4). Subparagraph (4) is addressed to persons who "manufacture, assemble, modify, import, export, sell, or distribute" an electronic device knowing or having reason to know that the device is used for the unauthorized decryption of satellite cable programming. It imposes criminal penalties for such conduct, as well as civil penalties, which are ten times the civil penalties for a violation of subsection (a). *See* 47 U.S.C. § 605(e)(3)(C)(i)(II). At least one court has held that a "reasonable reading of this provision demonstrates that § 605(e)(4) targets upstream manufacturers and distributors, not the ultimate consumer of pirating devices, such as Defendant." *DIRECTV, Inc. v. Albright*, No. Civ. A. 03-4603, 2003 WL 22956416, at *2 (E.D.Pa. Dec.9, 2003). Accordingly, we decline to award damages under 47 U.S .C. § 605(e)(3)(C)(i)(II) for a violation of subparagraph (4).
*4 DIRECTV has also asked for prejudgment interest, but as the court held in *DIRECTV, Inc. v. Albright*, 2003 WL 22956416, at *4, there is no statutory basis in § 605 for such an award.
The Court further finds that DIRECTV is entitled to a permanent injunction enjoining and restraining Getchel from importing, receiving, possessing, or using a pirate access device, and hereby directs Getchel to surrender all pirate access devices in his possession to DIRECTV. 47 U.S.C. § 605(e)(3)(B)(i) (authorizing the Court to grant temporary and final injunctions on such terms as it deems reasonable to prevent or restrain violations of subsection (a)); *see DIRECTV, Inc. v. Kaas*, 294 F.Supp.2d at 1049.
Last, DIRECTV seeks an award of litigation costs in the amount of $150.00 for filing fees and $90.00 for service of process fees, for a total of $240.00. These costs have been documented and are reasonable. 47 U.S.C. § 605(e)(3)(B)(iii) (allowing the recovery of full costs to an aggrieved party who prevails); *Community Television Systems, Inc. v. Caruso*, 284 F.3d 430, 434 n. 5 (2d Cir.2004) (holding that § 605 requires the court to award reasonable attorney's fees); *see Cablevision of Southern Connecticut*, 141 F.Supp.2d at 288 (awarding fees); *DIRECTV, Inc. v. Perrier*, 2004 WL 941641, at *4 (awarding fees). DIRECTV has provided no other evidence or documentation supporting its request for attorney's fees.

*Conclusion*

Accordingly, the Court awards damages of $4,800.00, and litigation costs of $240.00 in favor of Plaintiff, DIRECTV, Inc., and against Defendant, Brendan Getchel. The Court further permanently enjoins and restrains Defendant Getchel from importing, receiving, possessing, or using a pirate access device, and further directs Defendant Getchel to surrender to Plaintiff DIRECTV all pirate access devices in his possession.
The Clerk shall enter Judgment in accordance with this decision.
SO ORDERED.
D.Conn.,2004.
DIRECTV, Inc. v. Getchel
2004 WL 1202717 (D.Conn.)

Motions, Pleadings and Filings (Back to top)

• 3:03CV02073 (Docket) (Dec. 02, 2003)
END OF DOCUMENT

Copr. (C) 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1490307 (S.D.N.Y.)
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
CABLEVISION SYSTEMS NEW YORK CITY CORPORATION, Plaintiff,
v.
Catherine COLLINS, Defendant.
No. 01 Civ.10954 RO FM.
June 29, 2004.

*REPORT AND RECOMMENDATION TO THE HONORABLE RICHARD OWEN* [FN*]

FN* This Report and Recommendation was prepared with the assistance of Heather Burke, a first-year student at Fordham Law School.

MAAS, Magistrate J.
I. *Introduction*
 *1 In this action, plaintiff Cablevision Systems New York ("Cablevision") alleges that defendant Catherine Collins ("Collins") violated the Cable Communications Policy Act, as amended, 47 U.S.C. §§ 605(a) and 553(a)(1), by tampering with Cablevision's television system in order to receive its private telecommunications signals unlawfully through use of a "pirate" converter device. After Collins failed to answer the complaint, Your Honor entered a default judgment and referred the matter to me to conduct an inquest regarding Cablevision's damages. (*See* Docket No. 4).
On August 27, 2002, I directed Cablevision to serve and file an inquest memorandum by September 4, 2002, setting forth its proof of damages, as well as its proposed findings of fact and conclusions of law. The scheduling order gave Collins until September 18, 2002, to respond. Although Cablevision's papers were timely filed, Collins has neither filed any opposition papers, nor had any contact with this Court.
As detailed below, I recommend that Cablevision be awarded a total of $10,690, consisting of statutory damages in the amount of $10,000 plus reasonable attorneys' fees and costs in the amount of $690.
II. *Standard of Review*
In light of Collins' default, Cablevision's well-pleaded allegations concerning issues other than damages must be accepted as true. *See Cotton v. Slone,* 4 F.3d 176, 181 (2d Cir.1993); *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir.1992); *Time Warner Cable of New York City v. Barnes,* 13 F.Supp.2d 543, 547 (S.D.N.Y.1998); *Cablevision Sys. New York City Corp. v. Lokshin,* 980 F.Supp. 107, 111 (E.D.N.Y.1997).
Additionally, although a plaintiff seeking to recover damages against a defaulting defendant must prove its claim through the submission of evidence, the Court need not hold a hearing as long as (i) it has determined the proper rule for calculating damages, *see Credit Lyonnais Secs. (USA), Inc. v. Alcantara,* 183 F.3d 151, 155 (2d Cir.1999), and (ii) the plaintiff's evidence establishes, with reasonable certainty, the basis for the damages specified in the default judgment. *See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 111 (2d Cir.1997); *Fustok v. ContiCommodity Servs., Inc.,* 873 F.2d 38, 40 (2d Cir.1989); *see also Tamarin v. Adam Caterers, Inc.,* 13 F.3d 51, 53-54 (2d Cir.1993) (inquest on damages without hearing improper where based upon "single affidavit only partially based upon real numbers").
III. *Factual Findings*
On the basis of the complaint and Cablevision's inquest papers, I find as follows:
Cablevision is a division of CSC Holdings, Inc., a Delaware corporation, authorized to conduct business in New York, which maintains its principal office at 1111 Stewart Avenue, Bethpage, New York. (Compl.¶ 4).

Collins, at all relevant times, resided at 2440 Boston Road, Apt. 17K, Bronx, New York. (*Id.* ¶ 4; Aff. of Charles Carroll, sworn to on Aug. 28, 2002 ("Carroll Aff."), ¶ 18).

*\*2* Pursuant to government franchises, Cablevision constructs, operates and maintains cable television systems in parts of Bronx County as well as other counties. (Compl.¶ 6). Cablevision offers its customers various tiers of programming services including "Basic," "Family," and "Optimum" which a subscriber may purchase for a monthly fee. (*Id.* ¶ 7). "Basic" service provides a subscriber with broadcast stations as well as a small number of additional programming services. (Carroll Aff. ¶ 3). "Family" service is a higher level of programming that includes all of Cablevision's services with the exception of "premium" and pay-per-view programming. (*Id.*). "Optimum" service provides all programming available under "Family" service and premium stations. (*Id.*). A subscriber may pay for premium services at a higher monthly rate, or may choose to purchase pay-per-view programming for a pay-per-event fee in addition to the regular monthly fee. (*Id.* ¶¶ 4-5). Premium services include channels such as HBO, Cinemax and Showtime, and range in price from approximately $1.95 to $14.95 per month, while packages of premium services range in cost between $40.75 and $80.95. (*Id.* ¶ 4). Pay-per-view programming is offered continuously throughout a 24-hour period and consists of individual movies and sporting events. (*Id.* ¶ 5). The pay-per-view items typically cost a subscriber between approximately $4.50 and $49.95 per selection. (*Id.*). Over the course of a typical month, the aggregate value of Cablevision's pay-per-view programs, assuming each is viewed once, is hundreds of dollars. (*Id.*).

Satellites transmit the signals for Cablevision's cable television services to Cablevision's reception facilities. (Compl.¶ 10). Those signals then are retransmitted to subscriber's homes and businesses through a network of cable wiring and equipment. (*Id.*).

Each subscriber is entitled to receive only the level of programming and services that the subscriber has specifically selected and purchased. (Carroll Aff. ¶ 7). The signals of that specific programming are encoded or "scrambled" to prevent subscribers from receiving programming for which they have not paid. (*Id.* ¶ 9). Cablevision provides each subscriber with a converter-decoder box which is programmed by Cablevision to decode only the services and programs that the subscriber has purchased. (*Id.* ¶¶ 8, 10). Scrambled programming which has not been purchased remains distorted and unviewable. (*Id.*).

Despite this scrambling technology, a pirate converter-decoder can "descramble" Cablevision's signals so that the programming can be seen without paying first. (Compl.¶ 14). After commencing an action against Mega Electronics ("Mega") for the sale and distribution of such pirate converter-decoder devices, Cablevision obtained records regarding the sale and shipment of Mega's devices to purchasers across the country. (Carroll Aff. ¶¶ 15-17). The records show that, on July 21, 1999, Collins purchased two pirate converter-decoders from Mega. (*Id.* ¶ 19 & Ex. C). The decoders purchased by Collins can be used to defeat the encryption technology used by Cablevision in the Bronx. (*Id.* ¶ 20).

*\*3* Collins first subscribed to Cablevision's services on January 10, 1997. (*Id.* ¶ 18). In August 1999, one month after purchasing the pirate Mega converters, Collins downgraded her services from "Optimum Gold" to "Family" level. (*Id.* ¶ 18). In March 2001, Collins added HBO, which she later removed in August 2001. Collins upgraded her service to the "Optimum" level in October 2001, but later downgraded to the "Family" level in January 2002. (*Id.*). At the time of the default judgment, Collins subscribed to the "Family" level of service at a cost of $35 per month. (*Id* .).

For the foregoing services Collins paid Cablevision approximately $35 per month from August 1999 to March 2001 (approximately 19 months), $46.95 per month from March 2001 to August 2001 (approximately 5 months), [FN1] $35 per month from August 2001 to October 2001 (approximately 2 months), $80 per month from October 2001 to January 2002 (approximately 3 months) [FN2] and $35 per month from January 2002 to July 2002 (approximately 6 months). Therefore, after her purchase of the pirate boxes through the date of the default judgment, Collins paid Cablevision a total of $1,419.75 (($35 x 27 months) + ($46.95 x 5 months) + ($80 x 3 months)).

FN1. Cablevision offered premium services such as HBO at an average price of $11.95 for each premium channel. (Carroll Aff. ¶ 24). I have accordingly assumed that her monthly bill during this period was $46.95 ($35 + $11.95).

FN2. Cablevision's papers do not indicate the cost of an "Optimum" level of service. However, the price of "Family" service plus all premium services is approximately $80 per month. (Carroll Aff. ¶ 24).

IV. *Discussion*
A. *Statutory Damages*
Sections 553 and 605 of Title 47 of the United States Code prohibit the unauthorized interception and reception of cable programming services. [FN3] *Barnes,* 13 F.Supp.2d at 547-48 (citing *Int'l Cablevision, Inc. v. Sykes,* 75 F.3d 123, 133 (2d Cir.1996)); *Lokshin,* 980 F.Supp. at 112 ("In contrast to Section 553, which by its statutory language applies only to transmissions via cable systems, Section 605(a) applies to the 'interception of cable-borne, as well as over-the-air, pay television' where cable-borne transmissions originate as satellite transmissions.... Thus, when pay television programming is transmitted over both cable and satellite mediums, both statutes apply." (quoting *Sykes,* 75 F.3d at 130)).

FN3. Section 553(a)(1) provides, in part, that:

No person shall intercept or receive ... any communications service offered over a cable system unless specifically authorized to do so by a cable operator or as may otherwise specifically authorized by law.

Section 605(a) provides, in part, that:

No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person.

When a court determines that a defendant has violated both Sections 553 and 605, the aggrieved cable operator may recover damages under only one of those sections. *Sykes,* 75 F.3d at 127; *Barnes,* 13 F.Supp.2d. at 548; **American Cablevision of Queens v. McGinn,** **817 F.Supp. 317, 320 (E.D.N.Y.**1993). A plaintiff may, however, elect to recover damages under Section 605 in consideration of its higher damages award. *Sykes,* 75 F.3d at 127; *Barnes,* 13 F.Supp.2d at 548.
In this case, Collins purchased two descrambling devices capable of intercepting and receiving encrypted Cablevision signals. Moreover, it is apparent that she used them since she lowered her level of Cablevision service shortly after the purchase. Cablevision holds proprietary rights in the transmissions that Collins has intercepted and, therefore, is a "person aggrieved" within the meaning of 47 U.S.C. §§ 553(c)(1) and 605(e)(3)(A).
*4 Cablevision has elected to recover statutory damages under Section 605. (Carroll Aff. ¶ 29). Section 605(e)(C)(3)(ii) provides that the aggrieved party may recover no less than $1,000 and no more than $10,000 for each violation "as the court considers just." Not surprisingly, Cablevision seeks to recover the statutory maximum with respect to each Mega device, for a total of $20,000. (*Id.*).
Because the statute offers little guidance as to how to calculate damages, courts in this circuit have adopted two approaches to assessing damages in cases of unauthorized descrambling of signals by residential subscribers.
One approach has been to assess damages based on the difference between the amount of service for which defendants paid monthly and the amount their unauthorized use

enabled them to receive over the course of their misconduct. *See Lokshin*, 980 F.Supp. at 113 (finding award of $125 per month for pilfered pay-per-view services to be reasonable); **McGinn, 817 F.Supp. at 320** (imposing statutory damages of $250 per month per unauthorized decoder); *Time Warner Cable of N.Y. v. Rivera*, No. 94 Civ. 2339, 1995 WL 362429, at * 4 (E.D.N.Y. June 8, 1995) (Report & Rec. of Mag. J. Gold) (recommending approximately $1,000 in damages for eight months of pay-per-view programming); *Time Warner Cable of N.Y. v. Fland*, No. 97 Civ. 7197, 1999 WL 1489144, at * 4 (S.D.N.Y. Dec. 3, 1999) (Report & Rec. of Mag. J. Grubin) ($71.55 per month in unpaid premium services and $225 per month in pay-per-view services); *Cablevision Sys. New York City Corp. v. Santiago*, No. 02 Civ. 322, 2003 WL 1882254, at *5-*6 (S.D.N.Y. Mar. 17, 2003) (Report & Rec. of Mag. J. Freeman) ($45 per month in unpaid premium services and $110 per month in pay-per-view services). Other courts have awarded a flat sum based only on the court's determination of the appropriate damages given the circumstances of the case. *Barnes*, 13 F.Supp.2d at 548 (awarding a $1,000 flat sum); *Time Warner Cable of N.Y.C. v. Domsky*, No. 96 Civ. 6851, 1997 WL 33374593, at *6-*7 (S.D.N.Y. Sept. 2, 1997) ($1,000 in statutory damages per violation).

Although Collins' failure to submit any evidence makes it impossible to determine the actual period during which Collins was using at least one of her pirate decoders, it is reasonable to assume that she began using them within one month after her purchase when she downgraded her level of cable service. In the absence of any showing to the contrary, it is also reasonable to assume that she continued to use the pirate devices through the date of the default judgment, despite the various changes in her level of service. During that 35- month period the cost of obtaining all of Cablevision's premium services was approximately $80 per month. (Carroll Aff. ¶ 24). Collins would therefore have likely paid $2,800 ($80 x 35 months) for such services had she not used the unauthorized devices. During that period, however, Collins paid Cablevision only $1,419.75. Thus, if one assumes that Collins used her decoder boxes in this fashion, Cablevision's loss due to her unauthorized access of all its premium programming other than pay-per-view is approximately $1,380.25 ($2,800--$1,419.75).

*\*5* Estimating the amount of unauthorized pay-per-view programming which Collins received is somewhat more difficult. Cablevision claims that the aggregate value of each individual pay-per-view program offered over a typical month, is hundreds of dollars. (Carroll Aff. ¶ 5). Other courts in similar circumstances have estimated the revenue that a cable operator lost with respect to pay-per-view programming, based upon a reasonable assumption as to the number of high-cost and low-cost events the defendant likely watched each month. *See, e.g., Lokshin,* 980 F.Supp. at 113 ($125 in pay-per-view services per month based on an estimate of 16 selections priced at $5 each and four selections at an average cost of $11.25); *see also Fland,* 1999 WL 1489144, at *4 (estimating $225 in pay-per-view services each month without explaining the breakdown of that estimate). Consistent with these decisions, it is reasonable to assume that Collins would not have purchased each pay-per-view program every time it was shown, but, rather, would have watched at least three minimum-cost events per month plus one maximum-cost event. This would have resulted in an additional loss to Cablevision of $63.45 per month (($4.50 x 3) + $49.95) or $2,220.75 from August 1999 to July 2002 ($63.45 x 35 months).

The overall loss to Cablevision due to Collins' unauthorized access, is therefore approximately $3,601 ($1380.25 + $2220.75). However, as Magistrate Judge Ellis noted in *Domsky,* 1997 WL 33374593, at *6, awarding damages simply for the value of the services stolen by a defendant "would not be sufficient deterrence" since the penalty would merely be "the amount that should have been paid." Accordingly, it is appropriate to double the monthly damages for each month that Collins was likely using her illegal decoders. *Cablevision Sys. N.Y.C. Corp. v. Sencion,* No. 01 Civ. 7069, 2001 WL 1586685, at *3 (S.D.N.Y. Dec. 12, 2001) (Stein, J.); *Domsky,* 1997 WL 33374593, at *6. This would result in an award of statutory damages in the amount of $7,202.

Finally, in this case, Collins purchased two pirate decoders. Due to her default, it is unclear whether Collins used both decoders at her home or gave the second one to

another Cablevision subscriber. In these circumstances, it is appropriate to increase the statutory damages awarded, but doubling them seems unduly harsh. Instead, I recommend that the amount of statutory damages be increased to $10,000 (the statutory maximum for one infringing device).

B. *Attorneys' Fees*

Cablevision also seeks attorneys' fees and costs in the amount of $1,565. (*See* Affirm, of William, E. Primavera, Esq., dated Aug. 30, 2002 ("Primavera Affirm."), ¶ 13). As the prevailing aggrieved party, Cablevision is entitled to recover reasonable attorneys' fees and costs. 47 U.S.C. § 605(e)(3)(B)(iii). When fixing a reasonable rate for attorneys' fees, courts may consider and apply prevailing market rates "for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Gierlinger v. Gleason,* 160 F.3d 858, 882 (2d Cir.1998) (quoting *Blum v. Stenson,* 465 U.S. 886, 895 n. 11 (1984)). Moreover, a court may rely on its own knowledge of private firm hourly rates in estimating reasonable attorneys' fees. *Miele v. New York State Teamsters Cong. Pension & Ret. Fund,* 831 F.2d 407, 409 (2d Cir.1987).

*\*6* In the Second Circuit, a party seeking an award of attorneys' fees must support that request with contemporaneous time records that show, "for each attorney, the date, the hours expended, and the nature of the work done." *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1154 (2d Cir.1983). Attorneys' fees applications that do not contain such supporting data "should normally be disallowed." *Id.* at 1154; *see also* *Kingvision Pay-Per-View v. The Body Shop,* No. 00 Civ. 1089, 2002 WL 393091, at *5 (S.D.N.Y. Mar. 13, 2002) (Swain, J.) (denying award of attorneys' fees where information regarding how the fees were accumulated was not provided even though requested amount of $1,000 was reasonable).

In prosecuting this action, Cablevision availed itself of the services of William E. Primavera an associate with Lefkowitz, Louis & Sullivan, LLP. Primavera has submitted an affirmation setting forth (a) his professional experience; (b) the professional experience of the paralegals and legal assistants who worked with him; (c) the prearranged fees that Cablevision actually paid his employer for the work performed; and (d) the billing rate at which Cablevision seeks to be compensated. (Primavera Affirm. ¶¶ 2-13). The billing rates for each of the timekeepers seem more than reasonable. Nevertheless, as I have indicated previously, (*see* *Cablevision Sys. New York City Corp. v. Diaz,* No. 01 Civ. 4340, 2002 WL 31045855, at *4 (S.D.N.Y. July 10, 2002)), Cablevision is not entitled to be compensated for its lawyer's flat-rate billing.

In this case, Primavera has provided time sheets prepared by the timekeepers who worked on this matter. (*Id.* Exs. D-H.). Two of the time sheets do not reflect the actual hours expended, (*see id.* Exs. D, H), and must be disallowed. *See* *Santiago,* 2003 WL 1882254, at *7 (denying request for attorneys' fees where plaintiff sought legal fees based on flat-rate billing for certain work, but did not provide the number of hours expended).

The time records of the Lefkowitz firm which reflect actual hours expended relate to the work performed by four paralegals, each of whom has an $85 per hour billing rate. Those records indicate that Susan A. Weindler spent 0.3 hours (*see* Primavera Affirm. ¶ 10 & Ex. F); Alfonso N. Cava spent 0.4 hours (*see id.* ¶ 11 & Ex. G); Jeanine D. Colavito spent 0.3 hours (*see id.* ¶ 11 & Ex. H); and Janine P. Zabbia spent 5 hours working on this case. (*See id.* ¶ 9 & Ex. E). Accordingly, Cablevision is entitled to recover $510 for the legal services rendered by the Lefkowitz firm. ($85 x 6 hours).

C. *Costs*

Cablevision also seeks to recover $180 in costs, consisting of $30 for service of process and the $150 filing fee. This request is reasonable and should be allowed.

IV. *Conclusion*

For the reasons set forth above, I recommend that Cablevision be awarded damages in the amount of $10,690, consisting of $10,000 in statutory damages, $510 for attorneys' fees, and $180 for costs.

V. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

*\*7* The parties are hereby directed that if they have any objections to this Report and

Recommendation, they must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Richard Owen, United States District Judge, 40 Centre Street, New York, New York 10007, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Owen. Any failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); 28 U .S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b).

S.D.N.Y.,2004.

Cablevision Systems New York City Corp. v. Collins

2004 WL 1490307 (S.D.N.Y.)

END OF DOCUMENT

Copr. (C) 2004 West. No Claim to Orig. U.S. Govt. Works.